Lawrence **ROTHBLUM** et al.

v.

**BOARD OF TRUSTEES OF the COLLEGE OF MEDICINE & DENTISTRY OF NEW JERSEY** et al.

Appeal of Lawrence Rothblum et al.

No. 71-2049.

United States Court of Appeals,
Third Circuit.

Argued Nov. 30, 1972.

Decided Feb. 22, 1973.

As Amended March 13, 1973.

Jerry N. Friedland, Barr, Kaplus & Friedland, East Orange, N. J., for appellants.

George F. Kugler, Jr., John P. Sheridan, Deputy Atty. Gen., Trenton, N. J., for appellees.

Before BIGGS, KALODNER and ADAMS, Circuit Judges.

## OPINION OF THE COURT

BIGGS, Circuit Judge.

Rothblum and Gilbard and "John Doe", plaintiffs-appellants, allegedly citizens of New York and of the United States and federal taxpayers, filed an amended complaint (complaint) requesting the convening of a three-judge district court pursuant to 28 U.S.C. § 2281 et seq., and seeking to have certain alleged discriminatory admission practices of the New Jersey College of Medicine and Dentistry (College) declared to be unconstitutional. They seek their admission to the College and allege they were denied admittance to the College solely because of their foreign citizenship in violation of Article IV, Section 2(1),[1] Article I, Section 8(1)[2], and the Equal Protection Clause.[3] The amendment to the complaint was for the purpose of creating a class action. On June 18, 1971 a rule to show cause was issued by a single district judge as to why the relief sought should not be granted to the plaintiffs.[4] On June 25, June 30,

---

1. Article IV, Section 2(1) provides: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

2. Article I, Section 8(1) provides in pertinent part: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay Debts and provide for the Common Defence and general Welfare of the U.S. . . . . "

3. Amendment XIV, Section 1, provides in pertinent part: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."

4. Judge Whipple's original order is not clear. It states: "[T]he court having considered the verified complaint and application for temporary relief and memorandum and argument in support of this order to show cause, and *the court having determined that immediate and irreparable injury will result to plaintiffs if the relief requested in the complaint is not granted,* said relief including the admittance of plaintiffs to the freshman class.

and July 6, 1971, hearings were had before the district court. These hearings seem to have been devoted to the issues of whether or not a preliminary injunction should issue and whether or not a three judge district court should be convened pursuant to 28 U.S.C. §§ 2281 and 2284.

The essential allegations of the complaint which are supported by proof are as follows: "3. The Defendant Board of Trustees of the College of Medicine & Dentistry of New Jersey is the governing body of the Defendant College of Medicine of Dentistry of New Jersey and pursuant to N.J.S.A. 18A:64G–3 and 4 is vested with the government control, conduct, management and administration of Defendant College.

"Defendant Dr. Stanley S. Bergen, Jr., is the President of Defendant College and pursuant to N.J.S.A. 18A:64G–11 is responsible to the Defendant Board of Trustees and has the power of executive management and conduct of the Defendant College in all departments, branches and divisions, and for the execution and enforcement of the bylaws, rules, regulations and orders governing the management, conduct and administration of the Defendant College; This Defendant is sued in his official capacity.

"Defendant College of Medicine & Dentistry of New Jersey is an establishment in the Department of Higher Education of the State of New Jersey for the operation of a program of medical and dental education, created under N.J.S.A. 18A:64G–1 to 3, and is hereinafter referred to as 'The Medical School'.

"Defendant Dr. Arthur J. Kahn is Dean of Admissions of the College of Medicine of New Jersey, and has general supervisory authority over admissions to the Defendant medical school, and is sued in his official capacity.

"4. The Court has jurisdiction over the parties hereto and of the subject matter of the Complaint, and as will fully appear from the facts hereinafter set forth, a justiciable issue is raised which entitles the Plaintiffs, *inter alia,* to a declaratory judgment under United States Code, Title 28, Section 2201 as to the validity of the State policy hereinafter put in issue.

\*   \*   \*   \*   \*   \*

"6. Defendant 'medical school' is and has been the recipient of vast sums [5] of federal funds collected by the Government of the United States under its taxing power (Article I, Section 8(1)) and disbursed by the Government of the United States pursuant to legislation (42 U.S.C. 290, et seq.) passed under the authority to expend money for the general welfare (Article I, Section 8(1)) and to promote the Progress of Science (Article I, Section 8(8)). Upon information and belief, without the said federal funds, it would have been and would presently be economically impossible for the Defendant 'medical school' to perform its statutory functions under N.J.S.A. 18A:64G.

"7. Federal support of state and private health programs and functions issue from a comprehensive federal funding and health promotion plan outlined and authorized by 42 U.S.C., Section 290 et seq. Educational fund allocation provisions and fund use regulations and conditions comprising a massive health spending program are contained in 42 U.S.C., Section 292—Section 298c–8. This Congressional undertaking clearly reflects a federal recognition of the national character of problems like public

. . . " (Emphasis added.) The balance of the order, however, in pertinent part treats the finding of the first paragraph quoted as subject to the rule to show cause.

[5]. Simple inquiry would have informed counsel for the plaintiffs that the New Jersey College of Medicine was the recipient of a federal grant of $23,494,170.00 for a new facility. Construction Grants Administered by the Division of Physician & Health Professions Education (U.S. Dept. of Health, Education & Welfare, 1971).

health, health care, and medical education.

"8. The Defendants enumerated hereinabove have established and have implemented a policy of admission to the Defendant 'medical school' whereby applicants who are citizens of the State of New Jersey are given preference to equally qualified or more qualified applicants who are citizens of other States."

The amended complaint prays for injunctive relief against the College authorities' preferential admission policy and seeks to have the plaintiffs admitted to the College.

Rothblum and Gilbard applied for entrance into the freshman class of the College and sought to commence their studies on or about September 1971. Doe sought admission to the College with the class entering in September 1972. As we have said, all allege they were denied admission solely because they were not citizens of the State of New Jersey. At the hearings on the substantiality of the federal question involved, evidence was given by Dr. Arthur Kahn that the plaintiffs were refused admission because their marks were of such poor quality as not to warrant their entrance into the freshman class. It is interesting to note that at no time did Dr. Kahn categorically deny that New Jersey citizens seeking admission to the College were given preference. In fact, counsel for the College made such a concession.

The District Judge held in his letter memorandum of September 9, 1971 to counsel as follows:

"The only witness to testify at the hearing was Dr. Arthur Kahn, Dean of Student Affairs and Admissions. He stated that the admissions procedures of the College were established by an admissions committee composed of faculty members and students. Applicants to the College for the scholastic year commencing in 1971 were required to furnish the committee with a transcript of their undergraduate grades, two references and the scores of their Medical College Admissions Tests. Those applicants with high undergraduate cumulative averages (A, A— B+) were given personal interviews. Those applicants with favorable interviews were accepted into the College. Then, applicants with lower undergraduate cumulative averages (B, B—) were interviewed and either accepted or rejected.

"As a result of this procedure approximately 300–350 interviews were conducted and 225 acceptances were awarded for 110 places in the freshman class. Twenty seven non-New Jersey citizens received acceptances.

"Dr. Kahn admitted that as a result of oral communications from Chancellor of Education and the President and Dean of the College, New Jersey citizens were given preference over foreign citizens with the same cumulative averages. But he also testified that no applicant with a B— or C+ average was awarded an acceptance, and that applicants with averages of C+ or lower were not even afforded an interview.

"Both plaintiffs had cumulative averages of no better than C+ and consequently were not interviewed by the committee. Thus, defendants contend that (1) the College's preference for New Jersey citizens played no part in plaintiffs' rejection by the committee; (2) had plaintiffs been citizens of New Jersey they would have been similarly rejected and, therefore, (3) plaintiffs lack standing to challenge the alleged discriminatory procedures."

This is the basis of the district court decision and none other is asserted. Plaintiffs contend that a three-judge district court was required under 28 U. S.C. § 2281, and therefore the single district judge did not have authority to dismiss for lack of standing or go beyond the allegations of the complaint to decide this question. Secondly they argue that even if the district court did not exceed its authority, the court erred in its determination that the plaintiffs lacked standing. For reasons discussed

hereinafter, we find both these contentions to be without merit.

■■ Section 2281 is of deceptively simple nature. It has been said that the rules of review of whether a three-judge court is needed "are so complicated as to be virtually beyond belief." Wright, Law of Federal Courts, Hornbook Series, 2d ed., Ch. 8, Section 50, and Sardino v. Federal Reserve Bank of New York, 361 F.2d 106, 114 (2 Cir. 1966), cert. denied, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966).[6] The characterization of the statute just quoted is a large understatement. It appears to be the law that a three-judge court must be constituted if a substantial constitutional question is presented by the complaint. Ex parte Poresky, 290 U.S. 30, 32, 54 S.Ct. 3, 4, 78 L.Ed. 152 (1933): "The existence of a substantial question of constitutionality must be determined by the allegations of the bill of complaint." *Poresky* also teaches us that the claim is insubstantial if "it is obviously without merit" or its unsoundness is disclosed by previous decisions, probably of the Supreme Court.[7] See Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 716, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962); Gong v. Kirk, 375 F.2d 728, 729 (5 Cir. 1967); *Cf.* Oldroyd v. Kugler, 461 F.2d 535, 540 (3 Cir. 1972). Cf. Goosby v. Osser, 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36. From the face of the amended complaint it would appear that, however casual the language, there is a policy in effect in the College granting preferential admissions to citizens of New Jersey. A substantial constitutional issue, therefore, was before the district court, accepting literally the plaintiffs' allegations.

There are, however, other important considerations. A three-judge court "is required where the challenged statute or regulation, albeit created or authorized by a state legislature, has statewide application or effectuates a statewide policy. But a single judge, not a three-judge court, must hear the case where the statute or regulation is of only local import. Moody v. Flowers, 387 U.S. 97 [87 S.Ct. 1544, 18 L.Ed.2d 643] (1967); Rorick v. Board of Commissioners, 307 U.S. 208 [59 S.Ct. 808, 83 L.Ed. 1242] (1939); Ex Parte Public National Bank, 278 U.S. 101 [49 S.Ct. 43, 73 L. Ed. 202] (1928); Ex Parte Collins, 277 U.S. 565 [48 S.Ct. 585, 72 L.Ed. 990] (1928). This rule achieved the congressional purpose of saving statewide regulatory legislation from invalidation through ordinary federal court equity suits, minimized the burden which the three-judge court places upon the federal judiciary and avoided unduly expanding the [Supreme] Court's carefully limited appellate jurisdiction. Phillips v. United States, 312 U.S. 246, 250 [61 S.Ct. 480, 85 L.Ed. 800] (1941)." Board of Regents of University of Texas System v. New Left Education Project, 404 U.S. 541, 542–543, 92 S.Ct. 652, 653, 30 L. Ed.2d 697 (1972).

In *Regents, supra,* it was held that a suit to enjoin the enforcement of rules governing the distribution of certain kinds of literature, promulgated by the Board of Regents of the University of Texas System, was not one which required a three-judge district court since the rules applied to "but three of the 23 four-year state colleges and universities listed in the Higher Education Coordinating Act of 1965 [Texas Civ.Stat.

---

6. 28 U.S.C. § 2281 reads as follows: "An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

7. Local U. #300, Amalgamated Meat Cutters and Butcher Workmen of North America v. McCullough, 428 F.2d 396 (5 Cir. 1970).

Ann.], Art. 291(e)–2, § 2 (Supp.1970). . . . In addition . . ., Texas ha[d] at least 31 public junior colleges which [were] not within the University of Texas system. . . . It [was] therefore apparent that the Regents' rulemaking power and the rules at issue in this litigation extend[ed] to but a fraction of the campuses in the Texas System of higher public education." 404 U.S. at 543–544, 92 S.Ct. at 654. The Supreme Court therefore dismissed the appeal as one over which it had no jurisdiction. See 28 U.S.C. § 1253. Mr. Justice White stated: "These [Regents'] rules can scarcely be described as matters of statewide concern or expressions of a statewide policy when a large percentage of Texas colleges and universities are unaffected by them and could not be affected by any pronouncement that a federal court might make on their constitutionality. There is no suggestion or indication of any kind that the Regent's rules are similar to those for other schools or are required by or express statewide policy." See, *Regents*, at 544, 92 S.Ct. at 654, and n. 2 cited to the text.

In the case at bar a somewhat similar educational situation exists, albeit on a lesser scale than that of Texas. Rutgers University is the hub of New Jersey higher education. See N.J.S.A. 18A:65–3, providing for a state college for the benefit of agriculture and mechanic arts, The College of Arts and Sciences, the School of Business Administration, Douglass College, Paterson College, the Graduate School of Social Work, and the School of Law. It is provided that the Board of Governors shall have general supervision over and be vested with the conduct of the university and shall have the authority and responsibility, *inter alia,* to determine policies for the organization, administration and development of the university. N.J.S.A. 18A:65–25. See also, N.J.S.A. 18A:65–26. The specific statute creating the College of Medicine and Dentistry is set out below.[8] It will be observed

8. N.J.S.A. 18A:64G–1 to 4 provides:

"18A:64G–1. *Short title.* This act shall be known and cited as the 'Medical and Dental Education Act of 1970.'

"18A:64–G–2. *Findings and declaration.* The Legislature and Governor of the State of New Jersey hereby find that the establishment and operation of a program of medical and dental education is in the best interest of the State to provide greater numbers of trained medical personnel to assist in the staffing of the hospitals and public institutions and agencies of the State and to prepare greater numbers of students for the general practice of medicine and dentistry, and find, declare and affirm, as a matter of public policy of the State, that it is the responsibility of the State to provide funds necessary to establish and operate such programs of education, in the most economical and efficient manner, and that, in furtherance of such policy, the school of medicine heretofore established by Rutgers, The State University (hereinafter called the 'Rutgers Medical School') and the New Jersey College of Medicine and Dentistry shall be combined into a single entity to be known as the College of Medicine and Dentistry of New Jersey.

"18A:64G–3. *Establishment of College of Medicine and Dentistry.* There is hereby established in the Department of Higher Education the 'College of Medicine and Dentistry of New Jersey.' The exercise by the college of the powers conferred by this act in the presentation and operation of a program of medical and dental education shall be deemed to be public and essential governmental functions necessary for the welfare of the State and the people of New Jersey.

"18A:64G–4. *Board of Trustees.* a. The government, control, conduct, management and administration of the college shall be vested in the board of trustees of the college. The membership of the board of trustees shall consist of the Chancellor of the Department of Higher Education and the Commissioner of Health, who shall serve ex officio, without vote, and 11 voting members, each of whom shall be appointed by the Governor, with the advice and consent of the Senate, for a term of 3 years and shall serve until his successor is appointed and has qualified; except that, of the first appointments hereunder, four shall be for terms expiring June 30, 1971, four for terms expiring June 30, 1972, and three for terms expiring June 30, 1973. The term of each of the first appointees hereunder shall be designated by the Governor. Any vacancies in the voting mem-

that the College has a separate Board of Trustees, N.J.S. 18A:64G–4, unrelated to the other separate institutions of higher learning governed by Title 18A such as the School of Law or the College of Arts and Sciences. There is no suggestion or indication in the complaint or in the record that the policy challenged here exists at the other state schools or represents general state policy. The complaint does not even allege a rule-making power vested in the Trustees. The allegation is simply that the defendants have implemented a policy of admission for this one college preferring citizens of New Jersey to non-citizens. During the course of the hearings before the district court, counsel for the defendants stated that there was preferential treatment and that there was "some statement in one of the Board of Trustees' minutes" that deals with the problem of preferential admissions.[9]

We have stated that whether a three-judge court should be appointed pursuant to § 2281 depended upon the allegations of the complaint and if a sub-stantial constitutional issue was presented, a three-judge court should be appointed. The law as laid down by the Supreme Court in the *Regents* case is binding upon us and, of course, upon the court below,[10] and the allegations of the complaint must be viewed in the light of this law. The various provisions of Title 18A of the New Jersey statutes to which we have referred are also to be considered as part of the law of the case and were before the district court and must be deemed also to be completely relevant to the complaint. If the law of *Regents* be applicable here to render the "policy" of the Trustees of the College a local concern, then it was for the single judge to hear the case.

■ We are mindful of the fact that the College is the only medical and dental school in New Jersey created by New Jersey statute. But we think that *Regents* indicates that we should consider this one institution as only a small part of the entire New Jersey scheme of higher public education for purposes of determining whether the policy in ques-

---

bership of the board occurring other than by expiration of term shall be filled in the same manner as the original appointment but for the unexpired term only. Each voting member of the board of trustees before entering upon his duties shall take and subscribe an oath to perform the duties of his office faithfully, impartially and justly to the best of his ability. A record of such oath shall be filed in the office of the Secretary of State. Each voting member of the board may be removed from office by the Governor, for cause, after a public hearing.

"b. The members of the board of trustees shall meet at the call of the Governor for purposes of organizing. The board shall thereafter meet at such times and places as it shall designate.

"c. The Governor shall designate one of the voting members as chairman of the board. The board shall select such other officers from among its members as shall be deemed necessary.

"d. The board shall have the power to appoint and regulate the duties, functions, powers and procedures of committees, standing or special, from its members and such advisory committees or bodies, as it may deem necessary or conducive to the efficient management and operation of the college, consistent with this act and other applicable statutes."

9. See Minutes, Board of Trustees, College of Medicine and Dentistry of New Jersey, Jan. 7, 1971, p. 5: "Tuition and out of state students: It was agreed that the Board would not recommend any change in the current tuition and fees charged students of the college. Following discussion of the current situation, it was also agreed that no rigid limitation should be established on the proportion of out-of-state students admitted to the College, but that informal guidelines should be established by the admission officers at each center on this matter."

It should be made clear that the College of Medicine and Dentistry of New Jersey is an autonomous institution run by its own trustees.

It is also interesting to note that the College includes four schools: The Graduate School of Biomedical Sciences, Newark; New Jersey Dental School, Jersey City; New Jersey Medical School, Newark, and Rutgers Medical School, Piscataway.

10. The *Regents* case was not decided at the time Judge Whipple entered the judgment appealed from here.

tion is "statewide." In *Regents*, it is apparent that medical and other specialized schools were so regarded.[11] Therefore, as was the case in *Regents*, the policy here may not be said to be a matter of statewide concern or statewide policy when a large percentage of New Jersey's public institutions of higher education are unaffected by it and could not be affected by any pronouncement which a federal court might make on its constitutionality. In short, this policy, "applying only to some of the higher educational institutions of the State, [is] of limited significance and [does] not partake of the quality and dignity of those state statutes or policies that three-judge courts were designed to consider." 404 U.S. at 545, 92 S.Ct. at 655. There can be no "improvident *state-wide* doom by a federal court" of a state's policy in the case at bar. Phillips v. United States, 312 U.S. 246, 251, 61 S.Ct. 480, 483, 85 L.Ed. 800 (1941) (Emphasis added).

Since we hold that this was not a proper case for the convening of a three-judge district court, we need not reach the issue of whether in a case requiring three judges a single judge can consider matters outside the allegations of the complaint in deciding a plaintiff's standing. We therefore proceed to the plaintiffs' final contention, that the court below erred in its determination that the plaintiffs lacked standing.

■■■ The district court determined that the plaintiffs lacked standing to challenge the alleged discriminatory policy on the basis of uncontroverted evidence that such policy played no part in the rejection of their applications for admission. We agree.[12] "[A] person cannot challenge the constitutionality of a statute unless he shows that he himself is injured by its operation," as the Supreme Court stated in Barrows v. Jackson, 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1953). See Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Massachusetts v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). It is the fact of injury to the complainants, not to others, which justifies judicial intervention. See McCabe v. Atchison, Topeka and Santa Fe Railway Company, 235 U.S. 151, 162–164, 35 S.Ct. 69, 59 L.Ed. 169 (1914).[13]

■ In addition, the plaintiffs' assertion of standing as federal taxpayers under Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), is inapposite. Plaintiffs have not alleged the un-

11. See *Regents*, 404 U.S. at 543, 92 S.Ct. at 654, as follows: "It is true that the Board of Regents governs numerous medical and other specialized schools and branches, [Texas Civ.Stat.Ann.] Arts. 2603 e–i, 2606 b–d, but these are only some of the specialized institutions which Texas denominates as agencies of higher education."

12. The record is clear that both Rothblum and Gilbard were rejected solely for their C-plus averages and significantly poor records in science courses. Transcript of Hearings on June 30, 1971 and July 6, 1971, pp. 33–39. The policy of preference was only relevant as to residents and nonresidents with approximately equal academic records.

We have received an affidavit with accompanying letters (the latter being largely illegible) relating to the out-of-state student who was accepted despite his inferior academic records and standing. We conclude that, assuming the contents of the affidavit contained in Supplemental Record No. 2 are true and correct, nonetheless we do not deem this to be sufficient to set aside the judgment of the trial court on what is an obvious issue of fact.

13. The addition of "John Doe" as a party-plaintiff does not aid Rothblum and Gilbard. "John Doe" came first into English law as the fictitious plaintiff in the action of ejectment. See Bouvier's Law Dictionary, Rawle's 3rd Revision. We cannot deem the name "John Doe" to be a pseudonym in the instant case. Cf. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). We deem "John Doe" in the instant case to be a fictitious person and conclude therefore that there can be no justiciable controversy between him and the appellees under the circumstances at bar.

constitutionality of an exercise of congressional power under the taxing and spending clause of Art. I., § 8 of the Constitution, as was the case in *Flast*. The challenge here is to the policy of a recipient of federal tax dollars and not the federal funding plan itself, 42 U.S.C. § 290 et seq. Thus there is lacking the "logical link between that status [as taxpayers] and the type of legislative enactment attacked." Flast v. Cohen, *supra,* at 102, 88 S.Ct. at 1954.

Nor can the present suit continue as a class action. Since Rothblum and Gilbard lack standing to sue on their own behalf, "[t]hey cannot represent a class of whom they are not a part." Bailey v. Patterson, 369 U.S. 31, 32–33, 82 S.Ct. 549, 550, 7 L.Ed.2d 512 (1962). See also Thaxton v. Vaughan, 321 F.2d 474 (4 Cir. 1963); DiJulio v. Digicon, Inc., 339 F.Supp. 1284 (D.Md. 1972).

The judgment of the district court will be affirmed.