JUD D. DRUMMOND, Appellant and Cross-Respondent, v. MID-WEST GROWERS COOPERATIVE CORPORATION, a California Corporation, and CLAUDE JEROME HILL, Respondents and Cross-Appellants.

No. 7551

October 30, 1975                    542 P.2d 198

*McDonald, Carano, Wilson, Bergin & Bible,* Reno, for Appellant and Cross-Respondent.

*Goldwater Hill Mortimer Sourwine & Pinkerton,* Reno, for Respondents and Cross-Appellants.

## OPINION

By the Court, MOWBRAY, J.:

Jud D. Drummond commenced this action against Claude Jerome Hill and his employer, Mid-West Growers Cooperative Corporation, to recover damages for injuries Drummond received when he was assisting in the removal of a Mid-West truck, driven by Hill, that had stalled and was blocking the outside eastbound lane of Interstate 80 near Fernley, Nevada. The case was tried before a jury that found in favor of Drummond and against the defendants, awarding him damages in the amount of $9,640.35.

After all the evidence had been presented, Hill and Mid-West moved for a directed verdict in their favor. Decision on the motion was reserved, and the case went to the jury. After the jury returned their verdict, defendants moved for judgment notwithstanding the verdict. Drummond, who was not satisfied with the amount of his award, moved the court to grant additur or a new trial limited to the issue of damages. All motions were denied and appeals taken therefrom.

1. *The Facts.*

On July 17, 1972, Drummond was driving east on Interstate 80 to Ely. Just west of Fernley, he noticed a van stalled in the center median, and he stopped to help push it onto the highway. It was about 12:30 a.m. At this same time, Hill, driving a truck for Mid-West, was also traveling on Interstate 80. The Mid-West truck had a dead battery. Hill knew about the

battery. Several hours earlier, in Sparks, he had needed to use jumper cables to start the engine. Hill had decided to drive with the dead battery, expecting that driving would recharge the battery before he reached Winnemucca, his next scheduled stop. By the time Hill approached the scene, several motorists in addition to Drummond had stopped to help. Hill testified that he had not intended to stop, but only slowed down and moved into the inside lane in order to steer around another truck that had stopped and was partially blocking the outside lane. As Hill slowed and was shifting gears, someone yelled at him to ask if he had a chain. At that point, his truck stopped. Drummond testified that Hill parked alongside the median, and subsequent events established that Hill was carrying a chain. Because of the dead battery, he could not restart the engine.

Fully blocking the fast lane of the freeway, the Mid-West truck created an emergency situation. Efforts were quickly organized to chain one of the other trucks at the scene to the Mid-West truck and then tow it off the highway. Drummond suggested using a padlock to hold the chain together. After the Mid-West truck had been pulled just a few feet, the padlock broke. As Hill retrieved the padlock, Drummond waited between the trucks to reattach the chain. As he waited, a car driven by Sharon Williams crashed into the back end of the Mid-West truck, pushing the truck forward and crushing Drummond's arm against the other truck.

There was conflicting evidence as to whether or not Hill had his emergency lights on at the time of the collision. It was undisputed that, contrary to State law (NRS 484.627)[1] and

---

[1]NRS 484.627, in relevant part:

"1. Every bus, truck and truck-tractor and every combination of vehicles 80 inches or more in overall width, except implements of husbandry, shall be equipped with at least three pot torches, three red electric lanterns or three red emergency reflectors.

"2. Except as otherwise provided in subsections 3, 4 and 5, when any such vehicle is disabled on any portion of the traveled portion of a highway during any time specified in NRS 484.545, such torches, lanterns or reflectors shall be placed as soon as possible as follows:

"(a) One at the traffic side of the vehicle, not more than 10 feet to the front or rear thereof;

"(b) One at a distance of approximately 100 feet to the rear of the disabled vehicle in the center of the traffic lane occupied by such vehicle; and

"(c) One at a distance of approximately 100 feet to the front of the vehicle in the center of the traffic lane occupied by such vehicle.

". . .

"4. When any such vehicle is disabled on any portion of the traveled portion of a one-way highway with two or more traffic lanes during any time specified in NRS 484.545, such torches, lanterns or

federal regulation [Motor Carrier Safety Regulations, § 392.22, 49 C.F.R. § 392.22 (1974)],[2] Hill had not placed the required three flares, lanterns, or reflectors at distances of 10, 100, and 200 feet, respectively, to the rear of his disabled vehicle in the blocked lane. Instead, Hill had sent one of the bystanders down the highway behind the truck with a flashlight to warn approaching motorists. Drummond testified that he also gave his flashlight to one of his passengers and sent him behind the Mid-West truck. Another motorist, approaching the scene as Williams had, testified that he could not tell that an accident had occurred until he was within 100 feet of it. There was also testimony that the use of the flashlights may have been confusing, perhaps actually directing oncoming drivers into the blocked lane. On the other hand, there was testimony that numerous vehicles had passed the trucks safely. There was additional evidence as well that Williams had been drinking,

---

reflectors shall be placed as soon as possible as provided in subsection 2, except that the torch, lantern or reflector to be placed at the front of the vehicle shall be placed 200 feet to the rear of the vehicle."

[2]Motor Carrier Safety Regulations, § 392.22, 49 C.F.R. § 392.22 (1974):

"(a) . . .

"(b) Placement of warning devices—(1) *General rule.* Except as provided in subparagraph (2) of this paragraph, whenever a vehicle is stopped upon the traveled portion of a highway or the shoulder of a highway for any cause other than necessary traffic stops, the driver shall as soon as possible, but in any event within 10 minutes, place the warning devices with which his vehicle is equipped in conformity with the requirements of § 393.95 of this subchapter, either three emergency reflective triangles, three electric emergency lanterns, three liquid-burning emergency flares, or three red emergency reflectors in the following manner:

"(i) One at the traffic side of the stopped vehicle, within 10 feet of the front or rear of the vehicle;

"(ii) One at a distance of approximately 100 feet from the stopped vehicle in the center of the traffic lane or shoulder occupied by the vehicle and in a direction toward traffic approaching in that lane; and

"(iii) One at a distance of approximately 100 feet from the stopped vehicle in the center of the traffic lane or shoulder occupied by the vehicle and in the direction in which traffic in that lane is moving.

"(2) Special rules—(i) . . .

". . .

"(v) *Divided or one way roads.* If a motor vehicle is stopped upon the traveled portion on the shoulder of a divided or one-way highway, the driver shall place the warning devices required by subparagraph (1) of this paragraph, one warning device at a distance of 200 feet and one warning device at a distance of 100 feet in a direction toward approaching traffic in the center of the lane or shoulder occupied by the vehicle. He shall place one warning device at the traffic side of the vehicle within 10 feet of the rear of the vehicle."

was driving at excessive speed, was oblivious of the flagmen, and had not applied her brakes at all.[3]

2. *Defendants' Motions for a Directed Verdict or for Judgment Notwithstanding the Verdict.*

Hill and Mid-West claim, as the basis for their motions, that there was insufficient evidence to establish Hill's negligence, that Williams's negligence was the sole proximate cause of the accident, and that the evidence established that Drummond was contributorily negligent or had assumed the risk of injury. The evidence must be viewed in the light most favorable to the party against whom the motion is made. Neither the credibility of witnesses nor the weight of the evidence will be considered. Bliss v. DePrang, 81 Nev. 599, 407 P.2d 726 (1965). The standard for review is whether the evidence is such that reasonable men would have necessarily reached a different conclusion. The conflicting evidence presented created material issues of fact. The jury was the trier of those facts. For the reasons stated below, we affirm the trial court's order denying defendants' motions for a directed verdict or for judgment notwithstanding the verdict.

A. *Hill's Negligence.*

Drummond charged Hill with various acts of negligence. It is unnecessary at this juncture to review the evidence at length. Suffice it to say that it is sufficient to support the jury verdict. Hill chose to drive with a dead battery. He stopped with the truck fully on the freeway. He may have failed to utilize his emergency lights. He admitted violating state and federal law by not placing flares or lanterns as required, behind his truck. The jurors were properly instructed that they might consider these violations as evidence of negligence.

B. *Williams's Negligence.*

Williams's negligence was not the sole proximate cause of the accident as a matter of law. There was evidence to sustain the jury's finding that Hill's negligence was a concurrent proximate cause.

The defendant's negligence must be established as a proximate cause of the plaintiff's injury. We have previously

---

[3]Williams died as a result of the crash.

defined "proximate cause" as "any cause which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury complained of and without which the result would not have occurred." Mahan v. Hafen, 76 Nev. 220, 225, 351 P.2d 617, 620 (1960). An "efficient intervening cause" is "not a concurrent and contributing cause but a superseding cause which is itself the natural and logical cause of the harm." Thomas v. Bokelman, 86 Nev. 10, 13, 462 P.2d 1020, 1022 (1970). Not every intervening cause, or even every negligent intervening cause, acts as a superseding cause absolving the prior negligence. Konig v. Nevada-California-Oregon Ry., 36 Nev. 181, 135 P. 141 (1913); Alex Novack & Sons v. Hoppin, 77 Nev. 33, 359 P.2d 390 (1961).

Hill and Mid-West claim that the negligence of Williams "caused" the accident and, because it was an efficient intervening force, they are relieved of liability. In support of their position, they cite City of Reno v. Van Ermen, 79 Nev. 369, 385 P.2d 345 (1963), in which the defendant-appellant's possible negligence was held, as a matter of law, not a proximate cause of the plaintiff's injuries. Van Ermen was similarly an action by a third party injured when a speeding motorist crashed into an obstruction created by the alleged negligence of another. As in the present case, the action was brought not against the motorist but against the party responsible for the obstruction. A significant difference between Van Ermen and the instant case, however, is that the plaintiff, Van Ermen, was a passenger in the speeding car, brought into the harm by the motorist, while Drummond became imperiled as he tried to remove the obstruction on the highway. As we acknowledged in Konig v. Nevada-California-Oregon Ry., *supra*: "Each case presents its own particular set of circumstances, and a definition of proximate cause which might apply to one might be entirely inapplicable to another." 36 Nev. at 215, 135 P. at 153.

In Konig, we also said that the test for proximate cause could be "found in the probable injurious consequences which were to be anticipated. . . ." 36 Nev. at 214, 135 P. at 153. Taking the evidence as it favors Drummond, the emergency situation produced by Hill's negligence prompted efforts at rescue. Assessing the circumstances, a jury could reasonably decide that a foreseeable risk of harm to the rescuers from a negligent or nonnegligent motorist had been created. As part of the prior risk, foreseeable intervening forces are within the scope of the prior negligence and do not negate liability.

### 3. *The Evidence.*

The evidence does not establish contributory negligence or assumption of risk as a matter of law.

Defendants' third ground of error in the verdict charges plaintiff with contributory negligence or assumption of risk. However, before these charges may be analyzed, plaintiff's role in the incident preceding his injury must be defined.

Drummond's claim of "rescuing" was controverted at the trial. Although defendants acknowledged that an emergency situation had been created, they insisted that peril was not imminent and that Drummond's help had not been sought or needed. The potential for harm, however, was, if not imminent, at least immediate and real. And Drummond was in fact giving assistance. There is sufficient contrary evidence to preclude finding the rescue doctrine inapplicable here as a matter of law. Therefore, since Drummond is entitled on this appeal to the benefit of all reasonable inferences from conflicting evidence, we must treat him for these purposes as a rescuer.

### A. *Assumption of Risk.*

This defense is not ordinarily available against the rescuer. The jury here was properly instructed not to consider "assumption of risk" unless it found that the rescue doctrine did not apply. "Assumption of risk" is based on the injured plaintiff's actual knowledge of the danger and his voluntary exposure to it. Sierra Pac. Power Co. v. Anderson, 77 Nev. 68, 358 P.2d 892 (1961); Downing v. Marlia, 82 Nev. 294, 417 P.2d 150 (1966). In this case, actual knowledge may be inferred from Drummond's experience as a truck driver. But, even with actual knowledge, the individual is not "voluntarily" accepting the risk if he is compelled by an emergency situation to endanger himself. "The law does not discriminate between the rescuer oblivious of peril and the one who counts the cost." Wagner v. International Ry., 133 N.E. 437, 438 (N.Y. 1921).

### B. *Contributory Negligence.*

The rescue doctrine also modifies the measure of contributory negligence. The standard remains the objective "reasonable man" test, but it is the reasonable man acting under crisis pressure. As this court much earlier noted, courts generally are unlikely to find a party negligent as a matter of law for

not acting altogether wisely in an emergency. Bunting v. Central Pac. R.R., 14 Nev. 351, 361 (1879). In a comparable multivehicle accident case in which a "rescuer" was injured, a California district court of appeals recognized that the rescuer might be allowed to take actions which in other circumstances would be considered negligent. Scott v. Texaco, Inc., 48 Cal. Rptr. 785, 787 (Cal.App. 1966). The court suggested that "only conduct which amounts to rashness and recklessness" should be considered unreasonable and negligent conduct by a rescuer. 48 Cal.Rptr. at 787–788. The California Supreme Court later unanimously adopted this same view, in Solgaard v. Guy F. Atkinson Co., 491 P.2d 821 (Cal. 1971). Mr. Justice Burke wrote: ". . . [T]he rescue doctrine varies the ordinary rules of negligence . . . by requiring defendant to prove that the rescuer acted rashly or recklessly under the circumstances." 491 P.2d at 825.

In the case before us, Drummond testified that he did not consider the absence of flares, lanterns, or reflectors behind the Mid-West truck. He also stated that he had thought it safe to wait between the trucks because of the several vehicles that had passed the obstruction without difficulty. In determining contributory negligence, Drummond is charged only with the knowledge of a reasonable man. Judging his actions against the "reasonable man" standard for emergency actions, it cannot be maintained that Drummond was contributorily negligent as a matter of law.

4. *Plaintiff's Motion for Additur or for a New Trial Limited to the Issue of Damages.*

Drummond was 60 years of age at the time of the accident. After the accident, he was hospitalized in Washoe Medical Center, where he was treated by Dr. John Becker. The doctor testified that when he examined Drummond his forearm was crushed, and he inserted a pin and placed the arm in traction to aid circulation. Such treatment was not sufficient, because of the extent of the injury to the arm, and upon the setting in of gangrene, amputation of the arm became inevitable. In addition to the injury to his arm, Drummond suffered a fractured rib. He was given demerol and codeine to ease his pain, and following the amputation he was later fitted with a prosthetic device. The doctor testified that Drummond has an overgrowth of calcium on the stump of his arm which may give him discomfort, but which is not serious enough to warrant surgical intervention. He also stated that amputation

entails adverse psychological effects, such as feelings of helplessness and inadequacy. The doctor further testified that as a result of the amputation Drummond has lost the ability to do those things that require the use of a hand, and that a prosthetic device is not, and cannot be, an adequate substitute for a human hand; that a prosthetic device requires maintenance and periodic replacement at 5-year intervals or more frequently, depending on use. The medical expenses incurred to the date of the trial amounted to $4,640.35. The evidence established that the cost of such future medical expense with replacement every 5 years over Drummond's remaining 14.5 years' life expectancy, based upon the cost of the components of the prosthetic device, would be $3,087.70. The evidence further indicated that, even though Drummond's employment history was sporadic, he was employed immediately prior to the accident at an hourly rate of $8.21, and that his wages for the 3 days immediately preceding the accident had been $196.00.

Although the jury was properly instructed as to the elements of damage for which compensation should be awarded if it found that Hill and Mid-West were liable for Drummond's injuries, the jury's verdict, while in favor of Drummond on the issue of liability, awarded damages in the total amount of only $9,640.35. Drummond filed a timely motion for additur to the verdict, predicated upon the inadequacy of the award, or, in the alternative, for a new trial limited to the issue of damages. The motion was denied.[4]

It has been recognized in Nevada that our courts have the power to condition an order for a new trial on the plaintiff's acceptance of remittitur. See Hotel Riviera, Inc. v. Short, 80 Nev. 505, 396 P.2d 855 (1964); Hahn v. Yackley, 84 Nev. 49, 436 P.2d 215 (1968); Bonelli v. Jones, 26 Nev. 176, 65 P. 374 (1901). Our courts, however, have not heretofore had the power to condition an order for a new trial on acceptance of an additur. We believe, for the reasons stated below, that they should have such power.

The early common law, prior to the seventeenth century, did not contain any provision for setting aside a jury verdict. It was not until the end of the eighteenth century that new trials were granted for excessive damages in tort actions. See Bender, *Additur—The Power of the Trial Court to Deny a New Trial on the Condition that Damages Be Increased*, 3 Cal. W.L.Rev. 1 at 3–4 (1967). The use of additur and remittitur

---

[4]Drummond's motion for attorneys' fees, however, was granted.

never developed to any significant extent in England. However, remittitur became fairly common in the United States during the nineteenth century and is now almost universally accepted. *Id.,* at 4–6. Additur, on the other hand, developed differently. In 1935, the issue of the validity of an additur order was presented to the United States Supreme Court. Dimick v. Schiedt, 293 U.S. 474 (1935). The High Court held that an additur order infringed upon the plaintiff's right to a jury trial under the Seventh Amendment to the United States Constitution, predicating its holding upon the premise that the common law rules governing the granting of new trials as they existed at the time of the adoption of the Federal Constitution in 1791 were controlling.

The historical approach, condemned by the Justices who dissented in Dimick, as the "search of the legal scrap heap of a century and a half ago,"[5] has generally been rejected by the state courts that have considered the issue of additur.[6] The guarantee of trial by jury provided in the Seventh Amendment to the United States Constitution, which is not binding on the states,[7] is substantially different from the jury trial guarantees of most state constitutions, including the Nevada Constitution.

The Seventh Amendment to the United States Constitution states:

"In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, *and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."* (Emphasis added.)

It was the constitutional prohibition of reexamination of a fact tried by a jury, other than according to common law, which was the basis of the Court's decision in Dimick. Thus, the amount of damages is a *fact* tried by a jury; common law did not permit reexamination of such fact by a motion for additur; therefore, reexamination of the amount of damages by additur was in violation of the Seventh Amendment to the United States Constitution. However, the "reexamination

---

[5]Justice Stone wrote a dissenting opinion in which Chief Justice Hughes and Justices Brandeis and Cardozo concurred.

[6]See Smith v. Ellyson, 115 N.W. 40 (Iowa 1908); Genzel v. Halvorson, 80 N.W.2d 854 (Minn. 1957); Volker v. First Nat'l Bank, 42 N.W. 732 (Neb. 1889); Fisch v. Manger, 130 A.2d 815 (N.J. 1957); Caudle v. Swanson, 103 S.E.2d 357 (N.C. 1958); Bodon v. Suhrmann, 327 P.2d 826 (Utah 1958); Markota v. East Ohio Gas Co., 97 N.E.2d 13 (Ohio 1951).

[7]See Pearson v. Yewdall, 95 U.S. 294, 296 (1877); Walker v. Sauvinet, 92 U.S. 90, 92 (1875).

clause" forms no part of the jury trial guarantee set forth in article 1, section 3, of the Nevada Constitution, which states:

"The right of trial by Jury shall be secured to all and remain inviolate forever; . . ."

Nevada courts, like the courts of other states with similar constitutional provisions, are not inextricably bound to the accidents of history, nor compelled forever to retain the trappings of 1791 jurisprudence with regard to the nature of a jury trial. See Feldhahn v. Van Deventer, 115 N.W.2d 862 (Iowa 1962); and Richmond v. Campbell, 136 S.E.2d 877 (W.Va. 1964). In Jehl v. Southern Pac. Co., 59 Cal.Rptr. 276, 280, 281, 282–283, 427 P.2d 988, 992, 993, 994–995 (Cal. 1967), Chief Justice Traynor, speaking for the California Supreme Court, reviewed and rejected the reasoning of Dimick and affirmed the power of the California courts to award additur, stating:

"In *Dorsey* [*v. Barba,* 38 Cal.2d 350, 240 P.2d 604 (Cal. 1952)] this court held that additur would deny a plaintiff's right to jury trial as guaranteed by article 1, section 7 of the California Constitution. Although the Seventh Amendment to the United States Constitution is not binding on the states and differs significantly in language from the California constitutional provision, *Dorsey* relied in large part on *Dimick v. Schiedt,* 293 U.S. 474, . . . *Dimick* was a five-to-four decision and has been vigorously criticized. Like *Dorsey, Dimick* was based on an historical and logical analysis that was open to serious question. . . .

". . .

"In assessing the precedents, we search for the meaning and substance of jury trial and are not rigidly bound by the exacting rules that happen to be found on 'the legal scrap heap of a century and a half ago.' (Dimick v. Schiedt, supra, 293 U.S. at 495, . . . [Stone, J. dissenting]; see People v. Hickman, 204 Cal. 470, 476, 268 P. 909 [1925], 270 P. 1117 [1928]).

. . .
". . .

"Remittitur happened to develop earlier than additur because courts undertook to grant new trials for excessive damages long before they took similar action on the ground of inadequacy. (See McCormick on Damages, pp. 72–73; Washington, Damages in Contract at Common Law, 47 L.Q. Rev. 345, 365, fn. 7.) The issue of additur was not presented until modern times, but it is a logical step in the growth of the law relating to unliquidated damages as remittitur was at an earlier date. Its acceptance, though still somewhat retarded, is

growing. It should not be treated differently from other modern devices aimed at making the relationship between judge and jury as to damages as well as to other matters, one that preserves the essentials of the right to jury trial without shackling modern procedure to outmoded precedents. Additur does not detract from the substance of the common law trial by jury. Like its fraternal twin remittitur, now over 100 years old in this state, it promotes economy and efficiency in judicial proceedings." (Footnotes omitted.)

The tenuous argument that remittitur leaves standing a part of the jury's award, whereas additur constituted "a bald addition" to the verdict, was considered and rejected by Chief Justice Traynor, who stated, in footnote 8 to the Jehl opinion, 59 Cal.Rptr. at 280, 427 P.2d at 992:

". . . There are several replies to this argument. In reaching the larger verdict involved in remittitur, the jury has rejected all smaller amounts just as they have rejected all larger amounts in reaching the smaller verdict involved in additur. Neither verdict is more that of the jury than the other. (See Carlin, Remittiturs and Additurs, . . ., 49 W.Va. L.Q. 1, 18, 24–25; see also [Note,] 44 Yale L.J. 318, 323.) Only additur retains all that was contained in the jury's verdict, and in both additur and remittitur something is taken from the litigant who is relying on the verdict. (See Bender, Additur—The Power of the Trial Court to Deny a New Trial on the Condition that Damages be Increased, California Law Revision Commission. Recommendation and Study relating to Additur (Oct. 1966) at pp. 617, 647–648.)"

The Nevada Constitution guarantees to Respondents Hill and Mid-West the "right to a jury trial," i.e., the right to have factual issues determined by a jury. But the "right to a jury trial" does not mean that an error committed by a jury may not be corrected, merely because the vehicle of correcting such error was not known or practiced at common law when Nevada's Constitution was adopted. Cf. Misty Management v. District Ct., 83 Nev. 180, 183, 426 P.2d 728, 729 (1967):

"The notion that a favorable ruling upon a Rule 50(b) motion for judgment *n.o.v.* somehow violates the constitutional guaranty of a jury trial has been rejected by the United States Supreme Court. Neely v. Eby Construction Co., 386 U.S. 317 (1967), see also, Montgomery Ward & Co. v. Duncan, 311 U.S. 243 (1940). Further discussion on this point is not warranted."

The same reasoning applies to other post-trial procedures for correcting verdicts, and we find no reason in logic or common sense for excluding additur therefrom.[8]

We conclude, therefore, that additur does not detract from the substance of the common law trial by jury. Rather, additur, like its twin, remittitur, promotes economy and efficiency in judicial proceedings. Additur does not deprive a defendant of the right to go to the jury on any issue. It operates only in the event a plaintiff is dissatisfied with a jury's verdict.

There is no essential difference between the procedures appropriate for remittitur and additur. The court upon appropriate motion should first determine whether the damages are clearly inadequate and, if so, whether the case would be a proper one for granting a motion for a new trial limited to damages. If both conditions exist, the court in its discretion may issue an order granting the motion for a new trial, unless the defendant consents to an additur set by the court, within the time it allows.

We have reviewed the damages suffered by Drummond, and we have concluded that the award therefor is clearly inadequate. Drummond's medical expenses incurred at the time of trial were $4,640.35, and evidence indicated that future medical expenses, including maintenance and replacement of the prosthetic device, would exceed $4,000. Yet the total jury award was only $9,640.35. The record shows that Drummond has suffered a permanent injury resulting in extensive disability. Yet he apparently was awarded no damages for such permanent disability; nor could the award have included any sum for pain and suffering. In Jehl v. Southern Pac. Co., *supra,* the California Supreme Court held that an award of $100,000 was grossly inadequate for the loss of a leg and an injury which might result in the loss of a portion of the other leg. In Yost v. General Elec. Co., 173 F.Supp. 630 (S.D.N.Y. 1959), the court, sitting without a jury, assessed damages at $125,000

---

[8]Modern authority has demonstrated that additur is a just, speedy, efficient, and inexpensive vehicle to correct an inadequate jury verdict. See Ariz. Rules of Civil Procedure, Rule 59 (i)(1), 16 Ariz. Rev. Stat. Ann. (1967); La. Code Civ. Pro. Art. 1971 (1960); Mass. Gen. Laws Ann., ch. 231, § 127 (Supp. 1970); Miss. Code Ann. § 11–1–55 (1972); R.I. Gen. Laws Ann. § 9–23–1 (1956); S.D. Compiled Laws Ann. 15–6–59(a) (1967); Tenn. Code Ann. § 20–1330 (Supp. 1974); Wash. Rev. Code Ann. § 4.76.030 (1962).

for a 65-year-old machinist whose left arm was amputated two inches below the elbow.

The above cases demonstrate that when a limb is lost or severely disabled, the damage to the victim far exceeds just the medical expenses and loss of earnings. An arm or a leg is an integral, functioning part of the human body, and because its separation results in disability as well as pain and suffering it is recognized that an award of medical expenses or an amount slightly over the medical expenses, as in this case, is inadequate.

We therefore reverse the order denying Drummond's motion for additur or, in the alternative, a new trial limited to the issue of damages, and we remand the case to the district court with instructions to grant Drummond a new trial limited to the issue of his damages, unless the respondents, Hill and Mid-West, shall, within 20 days after the clerk of the court has filed the remittitur in this case, agree to an additur of $30,359.65, amounting to a total verdict of $40,000.00. The order denying respondents' motion for a directed verdict or judgment notwithstanding the verdict is affirmed.

GUNDERSON, C. J., and BATJER, ZENOFF, and THOMPSON, JJ., concur.