UNIVERSITY AND COMMUNITY COLLEGE SYSTEM OF NEVADA, Appellant, v. YVETTE FARMER, Respondent.

No. 25912

January 3, 1997　　　　　　　　　　930 P.2d 730

[Rehearing denied November 21, 1997]

*Donald Klasic,* General Counsel, University and Community College System of Nevada, Reno, for Appellant.

*Goedert & Michaels,* Reno, for Respondent.

## OPINION

By the Court, STEFFEN, C. J.:

Appellant, the University and Community College System of Nevada ("the University"), appeals from a final judgment, pursuant to a jury verdict, awarding respondent Yvette Farmer, an assistant professor of sociology at the University of Nevada, Reno, $40,000.00 in damages for violations of the Equal Pay Act ("the EPA"), Title VII of the Civil Rights Act, and for breach of an employment contract. The primary issues before us are whether the University was entitled to judgment as a matter of law and whether the district court erred by refusing to submit either of two jury instructions.

For reasons set forth hereafter, we reverse.

### FACTS

Between 1989 and 1991, only one percent of the University's faculty were black, and eighty-seven to eighty-nine percent of the full-time faculty were white. During this period, twenty-five to twenty-seven percent of the full-time faculty were women. In order to rectify the racial imbalance, the University instituted the "minority bonus policy," an unwritten amendment to its affirmative action policy which allowed a department to hire an additional faculty member following the initial placement of a minority candidate.

In 1990, the University published an announcement regarding an impending vacancy in the sociology department. The announcement for a replacement emphasized a need for proficiency in social psychology and formal organizations, with a stipulated salary range between $28,000.00 and $34,000.00, dependent upon experience and qualifications.

University hiring guidelines require departments to conduct more than one interview; however, this procedure may be waived. Although Farmer was one of the three finalists chosen by the search committee, the University claimed they followed procedural protocol by obtaining a waiver to only interview Johnson Makoba, a black African male emigrant. The department chair recalled that the search committee ranked Makoba first among the three finalists.

Because of a perceived shortage of black Ph.D. candidates, coupled with Makoba's strong academic achievements, the search committee sought approval to initially offer Makoba $35,000.00, with an increase to $40,000.00 upon completing his

Ph.D. This initial offer exceeded the advertised salary range of $28,000.00 to $34,000.00. Even though Makoba had not accepted any competing offers, the University justified its premium offer as a method of preventing a bidding war between two prestigious universities slated to interview Makoba. This strategy, according to the University, was designed to preempt other institutions from hiring Makoba.

Farmer claims that she was more qualified for the position initially offered to Makoba. However, the curriculum vitae for both candidates revealed comparable strengths with respect to their educational backgrounds, publishing, areas of specialization, and teaching experience. The search committee concluded that despite some inequalities, their strengths and weaknesses complemented each other; hence, as a result of the additional position created by the minority bonus policy, the department hired Farmer one year later. Although the University started Makoba at $35,000.00 with a $5,000.00 increase upon completing his dissertation, Farmer was offered a starting salary of $31,000.00 and a $2,000.00 raise after completion of her dissertation. This, according to the Dean of the College of Arts and Science, was slightly above the mean for new hires in the social sciences.

Starting with an initial pay differential of $7,000.00 upon completion of their dissertations, the pay gap has since widened to $10,838.00 because of Makoba's additional year of employment and differences in merit increases granted to Makoba and Farmer.

On January 13, 1993, Farmer filed a complaint alleging four causes of action. She first claimed that the University violated the Equal Pay Act by paying her unequal wages for equal work relative to a male employee of similar qualifications. Her second cause of action alleged race and gender violations under Title VII of the Civil Rights Act as amended in 1991. Farmer's third cause of action alleged that the University breached its employment contract with her by failing to abide by its promulgated policies delineating the terms and conditions of employment. Her fourth cause of action alleged a breach of the implied covenant of good faith and fair dealing.

The district court granted the University's motion for summary judgment as to Farmer's fourth cause of action, but denied summary judgment regarding the first three causes of action.

After the close of evidence, the district court rejected the following jury instruction offered by Farmer:

> The Equal Pay Act specifically forbids that Dr. Makoba's salary should be lowered to make two rates of pay equal.

The University then offered the following proposed jury instruction:

> The implementation by an employer of a race-conscious affirmative action policy designed to remedy the effects of past discrimination against a traditionally disadvantaged group, particularly to remedy a manifest imbalance in a traditionally segregated job category, is not a violation of Title VII of the Civil Rights Act, provided the rights of other persons are not unnecessarily trammeled or impeded.

The district court also rejected this instruction.

The jury returned a verdict in Farmer's favor for her first three causes of action, awarding her $40,000.00 in damages. The University timely filed a motion for a judgment notwithstanding the verdict, or in the alternative, for a new trial under NRCP 50(b) and 59(a). The district court denied the motion, prompting the University to appeal.

## DISCUSSION

### Standard of Review

In appealing from the final judgment, the University contends that the district court erred in denying its motion for judgment notwithstanding the verdict or, in the alternative, motion for a new trial. On review of a motion denying a judgment notwithstanding the verdict, we are enjoined to view the evidence in the light most favorable to the party against whom the motion is directed. Air Service Co. v. Sheehan, 95 Nev. 528, 530, 594 P.2d 1155, 1156 (1979). It is not this court's prerogative to consider the weight of the evidence or the credibility of witnesses. *Id.* In reviewing the denial of the motion for JNOV, the question we must ask and answer is whether the evidence of record " 'is such that reasonable men would have necessarily reached a different conclusion.' " *Id.* (quoting Drummond v. Mid-West Growers, 91 Nev. 698, 542 P.2d 198 (1975)). Of course, an order denying a JNOV motion will also be reversed if the final judgment is unwarranted as a matter of law. *See* McDevitt & Street Co. v. Mosher Steel, 574 So. 2d 794, 797 (Ala. 1991).

### Affirmative Action Analysis

The University contends that the district court made a substantial error of law by failing to enter a proposed jury instruction which would have apprised the jury that Title VII does not proscribe race-based affirmative action programs designed to remedy the effects of past discrimination against traditionally

disadvantaged classes. The University asserts that the district court's rejection of the proposed instruction left the jury with the impression that all race-based affirmative action programs are proscribed.

Farmer maintains that the University has not demonstrated that Makoba's race was "job related for the position in question and consistent with business necessities." Farmer also asserts that the University's unwritten minority bonus policy contravenes its published affirmative action plan. Finally, Farmer alleges that all race-based affirmative action plans are proscribed under Title VII of the Civil Rights Act as amended in 1991; therefore, the University discriminated against her as a female, a protected class under Title VII.

Tension exists between the goals of affirmative action and Title VII's proscription against employment practices which are motivated by considerations of race, religion, sex, or national origin, because Congress failed to provide a statutory exception for affirmative action under Title VII. *See* 42 U.S.C. § 2000e. Until recently, the Supreme Court's failure to achieve a majority opinion in affirmative action cases has produced schizophrenic results.

The permissible contours for voluntary affirmative action plans are blurred. There are, however, a few pivotal cases that provide guidance. In Regents of the University of California v. Bakke, 438 U.S. 265 (1978), the *Bakke* plurality held that in the limited setting of a graduate school, an attempt to attain a diverse student body through a preferential treatment admissions policy is not *per se* unconstitutional as long as race is one of several factors used in evaluating applicants. *Id.* at 314-18. Quotas, however, are proscribed. *Id.* at 318.

United Steelworkers of America v. Weber, 443 U.S. 193 (1979), is the seminal case defining permissible voluntary affirmative action plans. *See also* Johnson v. Transportation Agency, Santa Clara City, Cal., 480 U.S. 616 (1987). Under *Weber,* a permissible voluntary affirmative action plan must: (1) further Title VII's statutory purpose by "break[ing] down old patterns of racial segregation and hierarchy" in "occupations which have been traditionally closed to them"; (2) not "unnecessarily trammel the interests of white employees"; (3) be "a temporary measure; it is not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance." *Weber,* 443 U.S. at 208.

Since the advent of *Weber,* the Supreme Court's affirmative action decisions have displayed an accordion effect. City of Richmond v. J.A. Croson Co., 488 U.S. 469 (1989) (plurality

opinion), signaled a marked departure of equal protection analysis by requiring that the strict scrutiny standard apply for affirmative action jurisprudence. The Court criticized the City of Richmond's minority set-aside program for independent contractors in the construction industry as one which was not sufficiently and narrowly tailored. A year after *Croson,* the Court, in Metro Broadcasting Inc. v. FCC, 497 U.S. 547 (1990), abruptly changed course and held that the intermediate scrutiny standard of review applies towards congressionally mandated benign racial classifications.

Most recently, in Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 115 S. Ct. 2097 (1995), the Supreme Court revisited affirmative action in the context of a minority set-aside program in federal highway construction. In the 5-4 opinion, the Court held that a reviewing court must apply strict scrutiny analysis for all race-based affirmative action programs, whether enacted by a federal, state, or local entity. *Id.* at 4530. Building on the rationale of *Croson,* the Court explicitly stated "that federal racial classifications, like those of a State, must serve a compelling governmental interest, and must be narrowly tailored to further that interest." *Adarand,* 63 U.S.L.W. at 4533. In so holding, the Court overruled *Metro Broadcasting* which employed different standards of review to state and federal racial classifications. *Id.* at 4530.

Here, in addition to considerations of race, the University based its employment decision on such criteria as educational background, publishing, teaching experience, and areas of specialization. This satisfies *Bakke's* commands that race must be only one of several factors used in evaluating applicants. We also view the desirability of a racially diverse faculty as sufficiently analogous to the constitutionally permissible attainment of a racially diverse student body countenanced by the *Bakke* Court.

The University's affirmative action plan conforms to the *Weber* factors. The University's attempts to diversify its faculty by opening up positions traditionally closed to minorities satisfies the first factor under *Weber.* Second, the plan does not "unnecessarily trammel the interests of white employees." The University's 1992 Affirmative Action Report revealed that whites held eighty-seven to eighty-nine percent of the full-time faculty positions. Finally, with blacks occupying only one percent of the faculty positions, it is clear that through its minority bonus policy, the University attempted to *attain,* as opposed to *maintain,* a racial balance.

The University's affirmative action plan therefore passes constitutional muster. The University demonstrated that it has a compelling interest in fostering a culturally and ethnically diverse

faculty. A failure to attract minority faculty perpetuates the University's white enclave and further limits student exposure to multicultural diversity. Moreover, the minority bonus policy is narrowly tailored to accelerate racial and gender diversity. Through its affirmative action policies, the University achieved greater racial and gender diversity by hiring Makoba and Farmer. Of note is the fact that Farmer's position is a direct result of the minority bonus policy.

Although Farmer contends that she was more qualified for Makoba's position, the search committee determined that Makoba's qualifications slightly exceeded Farmer's. The record, however, reveals that both candidates were equal in most respects. Therefore, given the aspect of subjectivity involved in choosing between candidates, the University must be given the latitude to make its own employment decisions provided that they are not discriminatory.

In addition, Farmer cites no authority for her proposition that the 1991 amendments to Title VII proscribe affirmative action.[1] Notably, Farmer failed to include a contrasting provision which undermines her novel interpretation of § 2000e-2(m).[2]

Given the void created by the rejection of the jury instruction at issue, we conclude that the jury was not equipped to understand the necessary legal basis upon which it could reach its factual conclusions concerning the legality of the University's affirmative action plan. Moreover, the undisputed facts of this case warranted judgment in favor of the University as a matter of law. Therefore, even if the jury had been properly instructed, the district court should have granted the University's motion for

---

[1] 42 U.S.C. § 2000e-2(m) (Supp. V 1993) states:

> Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

The conduct Farmer complains of occurred prior to the effective date of the amended 1991 Civil Rights Act; therefore, those applicable portions of the amended Act are not controlling. Makoba was hired on July 1, 1990, followed by Farmer's appointment on July 1, 1991. The Civil Rights Act of 1991 went into effect on November 21, 1991.

[2] "Nothing in the amendments made by this title shall be construed to affect court-ordered remedies, *affirmative action,* or conciliation agreements that are in accordance with the law." § 116, 105 Stat. at 1079 (1991) (codified at 42 U.S.C. § 1981 note (Supp. V 1993) (emphasis added).

judgment notwithstanding the verdict. Reversal of the jury's verdict on the Title VII claim is therefore in order.

*The Equal Pay Act*

The University contends that it fully satisfied the requisites of the EPA and was entitled to judgment on this claim as a matter of law.

On the other hand, Farmer insists that the University's affirmative defense under the EPA was pretextual and that its true motivation for creating the wage disparity was rooted in gender discrimination. In order for Farmer to prevail on her EPA claim, she had to prove that the University's employment decision was impermissibly based on gender.

Corning Glass Works v. Brennan, 417 U.S. 188 (1974), is the seminal case interpreting the Equal Pay Act.[3] The Supreme Court stated that a prima facie case under the EPA is established if the plaintiff can show: (1) that an employer is paying different wages to employees of the opposite sex; (2) that the employees are performing jobs which require equal skill, effort, and responsibility; and (3) that the employees have similar working conditions. *Id.* at 190.

After the plaintiff has presented a prima facie case, an employer must then satisfy one of the EPA's four affirmative defenses in order to avoid liability. In *Corning,* the Court concluded that the burden of proof in proffering one of the four affirmative defenses rests with the defendant, even though the Act is silent on this issue. The employer must prove that the reason for the pay disparity is due to: ''(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity of production; or (iv) a differential based on any factor other than sex.'' *Id.* at 196.

The bulk of EPA litigation rests with the Act's fourth affirmative defense. The ''any factor-other-than-sex'' defense has often been referred to as a catch-all provision, and understandably, is the source of discriminatory abuse. In an effort to limit employer abuses under this catch-all provision, the courts have attempted to delineate nondiscriminatory factors other than sex. There is however, an acknowledged conflict among the circuit courts concerning an employer's burdens in raising this affirmative defense.

In Aldrich v. Randolph Cent. School Dist., 963 F.2d 520, 526

---

[3]Sex-based discrimination is the gravamen of The Equal Pay Act of 1963. 29 U.S.C. § 206(d)(1).

(2d Cir.), *cert. denied,* 506 U.S. 965, 113 S. Ct. 440 (1992), the court held that an employer must establish a bona fide business-related reason for establishing the factor-other-than-sex affirmative defense. Likewise, in Maxwell v. City of Tucson, 803 F.2d 444, 447 (9th Cir. 1986), the court determined that an employer satisfies the factor-other-than-sex defense by establishing legitimate organizational needs. *See* Kouba v. Allstate Ins. Co., 691 F.2d 873, 876 (9th Cir. 1982) (a wage differential between a male and female must be grounded in an acceptable business reason); E.E.O.C. v. J.C. Penney Co., Inc., 843 F.2d 249, 253 (6th Cir. 1988) (*any* factor will not satisfy the factor-other-than-sex defense, rather, a legitimate business reason must exist).

The Seventh Circuit, in Fallon v. State of Illinois, 882 F.2d 1206, 1211 (1989), reached a contrary position in ruling that "[t]his circuit . . . does not require that the factor-other-than-sex defense be related to the requirements of the particular position in question, or that it be a 'business-related reason[ ].' " We are not persuaded that the reasoning in *Fallon* furthers the purposes of the Equal Pay Act and elect to adopt the rationale and rulings of the Second and Ninth Circuits in *Aldrich* and *Maxwell.*

We conclude that the proper legal standard underlying the factor-other-than-sex defense requires, at a minimum, that an employer demonstrates a business-related reason for the wage disparity. It is essential that the factor-other-than-sex defense is business related in order to avoid the pitfalls otherwise created by such a broadly worded provision.

The most glaring statistic in this litigation is that only one percent of the University's faculty were black while eighty-seven percent were white. Concurrently, women occupied twenty-five to twenty-nine percent of the full-time faculty positions. The University sought to achieve progress in this manifest racial imbalance by hiring Makoba before Farmer. Clearly, the University had a bona fide business-related reason for attaining a culturally diverse faculty. It is undisputed that qualified minority applicants, who are in short supply, can command premium salaries in the open market. The search committee elected to avoid an all-out bidding war with other educational institutions by offering Makoba a salary commensurate with his credentials, his minority status, and his overall marketability.

Farmer has failed to demonstrate that the University's pay disparity was rooted in gender discrimination. Indeed, the University's Dean of the College of Arts and Science testified that the Chemistry Department had recently hired a female chemist at a higher salary than a male with similar qualifications in order to

diversify its faculty and provide a female role model. Market forces dictate higher salaries for female Ph.D.s in chemistry due to a shortage of qualified women.

Although the jury would have been in a better position to understand what the University could or could not do with respect to wage disparity in the context of the EPA if Farmer's proposed instruction to the jury had been accepted by the district court, the University is in no position to complain since it failed to join in proffering the instruction and objecting to its rejection.[4] We nevertheless conclude that the omission of the instruction is of no consequence to the resolution of this appeal. The undisputed facts reveal that the University did not base its employment decision on Farmer's gender. To the contrary, a manifest racial imbalance and market factors were the touchstone for the University's employment decision.

We conclude that the University has met its burden in avoiding liability under the EPA by demonstrating a legitimate business-related reason for the wage disparity between Farmer and Makoba. This satisfies the EPA's fourth affirmative defense, "a differential based on any factor other than sex." *Corning*, 417 U.S. at 196. Under the undisputed facts and the law, the judgment entered against the University pursuant to Farmer's second cause of action must be reversed.

## Breach of Contract

The disposition of the Breach of Contract claim is derivative in nature and wholly dependent on the resolution of the EPA and Title VII claims. According to Farmer's strained reading of the University's Affirmative Action statement,[5] the unwritten minor-

---

[4]As noted previously in the body of this opinion, the rejected instruction offered by Farmer would have instructed the jury that: "The Equal Pay Act specifically forbids that Dr. Makoba's salary should be lowered to make two rates of pay equal."

[5]The University of Nevada, Reno, Affirmative Action Statement of Policy and Intent provides in part:

> The University of Nevada, Reno in conformity with the Affirmative Action policy of the University of Nevada System and Federal law, is guided by the principle that there shall be no difference in the treatment of persons because of race, creed, color, sex, disability, religion, age, veteran status or national origin, and that equal opportunity and access to programs shall be available to all. This principle is applicable to every member of the University community, students and employed

ity bonus policy contravenes the University's affirmative action policy.

The University, as noted above, has adopted a lawful race-conscious affirmative action policy in order to remedy the effects of a manifest racial imbalance in a traditionally segregated job category. The unwritten minority bonus policy merely augments the University's Statement of Policy and Intent, which provides, in part: "Affirmative Action requires more than employment neutrality. It requires additional efforts to recruit, employ, retain and promote qualified women, minorities, handicapped and veterans."

The University has aggressively sought to achieve more than employment neutrality by encouraging its departments to hire qualified minorities, women, veterans, and handicapped individuals. The minority bonus policy, albeit an unwritten one, is merely a tool for achieving cultural diversity and furthering the substantive goals of affirmative action.

For the reasons discussed above, the University's affirmative action policies pass constitutional muster. Farmer has failed to raise any material facts or law which would render the University's affirmative action policy constitutionally infirm.

In view of our disposition of this appeal, it is unnecessary to address other issues on appeal. We note in passing, however, that it would appear that the University should have received the benefit of a summary disposition of all of the claims against it, thereby obviating the time and expense of trial.

## CONCLUSION

For the reasons discussed above, we conclude that the district court erred in denying the University's motion for judgment notwithstanding the verdict. We therefore reverse.

YOUNG and ROSE, JJ., concur.

SPRINGER, J., dissenting:

However "schizophrenic" the majority may find the United States Supreme Court's affirmative action jurisprudence, it is now

---

personnel at every level, and to all units, facilities, and services of the university.

In the employment of all personnel, the university recognizes that as a public agency, it is obligated to support Federal and State policies which seek to achieve affirmative action in employment for members of minority groups, women and the disabled. . . .

Affirmative Action requires more than employment neutrality. It requires the University of Nevada System to make additional efforts to recruit, employ, retain and promote qualified women, protected class minority group members, and the disabled.

firmly established that all racially discriminatory state actions, "benign" or otherwise, are permissible only if they are necessary to meet a compelling state interest. Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 115 S. Ct. 2097 (1995). I dissent because I do not think that the University's affirmative action program, enacted to remedy a perceived racial imbalance among the faculty, passes this strict standard of constitutional review; and I find no authority for the majority's assertion that "fostering a culturally and ethnically diverse faculty" is a sufficiently compelling reason for intentional racial discrimination by Nevada's public university.

In Hopwood v. State of Texas, 78 F.3d 932, 945-46 (5th Cir. 1996), *cert. denied,* ...... U.S. ......, 116 S. Ct. 2581 (1996), the United States Court of Appeals for the Fifth Circuit recently rejected the notion that an attempt to achieve racial diversity will satisfy this strict scrutiny standard.[1] As the *Hopwood* court noted, Justice Powell's diversity argument in Regents of the University of California v. Bakke, 438 U.S. 265 (1978), relied upon by the majority, garnered only his own vote and has never represented the view of a majority of the Supreme Court. 78 F.3d at 944. After review of the relevant Supreme Court cases, I turn to *Hopwood* and conclude that the racially discriminatory action taken by the University is constitutionally impermissible. "Cultural and ethnic diversity" simply cannot justify the University's undisguised racial discrimination in the pursuit of a more racially heterogeneous faculty.[2]

---

[1] *Cf.* Taxman v. Board of Educ. of Township of Piscataway, 91 F.3d 1547, 1558-63 (3rd Cir. 1996), *petition for cert. filed* (Congress neither addressed nor embraced racial diversity "for education's sake" as a purpose of Title VII, and nothing in federal case law, including the Supreme Court's equal protection cases, supports recognition of such a purpose.).

[2] One compelling interest recognized by the Supreme Court is remedying the effects of prior discrimination. *See, e.g.,* North Carolina State Board of Education v. Swann, 402 U.S. 43, 46 (1971); *see also* City of Richmond v. J.A. Croson Co., 488 U.S. 469 (1989) (plurality opinion); Wygant v. Jackson Board of Education, 476 U.S. 267 (1986) (plurality opinion). However, remedial race-based state action passes constitutional muster only if the race-based action is taken to remedy prior discrimination by the involved governmental unit, and not simply in response to statistical disparities resulting from general societal discrimination. *Wygant,* 476 U.S. 277-78 (plurality opinion of Powell, J.); *accord Croson,* 488 U.S. 469.

In the present case, in spite of the majority's loose reference to Dr. Makoba's position as a "traditionally segregated job category," the University has made no showing whatsoever that it has discriminated against blacks in hiring. In fact, as recognized by the majority, the purpose of the University's affirmative action hiring policy is simply to rectify a "manifest racial imbalance" among the faculty. Consequently, this is not a case of remedial affirmative action. Even if it were, it is difficult to see how hiring a recent emigrant from Africa would be an appropriate remedy for prior discrimination against black Americans.

I dissent from the majority opinion's affirmative action analysis. I also dissent from the majority's equal pay act analysis and join JUSTICE SHEARING's dissenting opinion in this regard. Accordingly, I would affirm the judgment of the district court.

SHEARING, J., dissenting:

I do not agree that the University was entitled to judgment as a matter of law on the cause of action alleging that the University violated 29 U.S.C. Sec. 206(d), the Equal Pay Act. I would affirm the judgment in favor of Farmer on that cause of action.

This case was submitted to a jury which reached a verdict in favor of Farmer. As the majority stated, on review of a motion denying judgment notwithstanding the verdict, this court must view the evidence in the light most favorable to the party against whom the motion is directed. Air Service Co. v. Sheehan, 95 Nev. 528, 530, 594 P.2d 1155, 1156 (1979). It is not this court's prerogative to consider the weight of the evidence or the credibility of witnesses. *Id.* The question we must ask and answer is whether the evidence of record is such that reasonable people would have necessarily reached a different conclusion. *Id.*

Accordingly, we must view the evidence in the light most favorable to Farmer. Regardless of our own inclinations, we must accept the fact that the jury believed that the disparity in pay between Farmer and her male colleague was based on gender discrimination. The University presented evidence that other factors were responsible for the disparity in pay between Farmer and her male colleague. Obviously the jury did not believe the University's witnesses. The University does not dispute that the jury was correctly instructed on the requirements and the burdens of proof under the Equal Pay Act. Appellant's only assignment of error in the instructions related to the allegations of violation of Title VII of the Civil Rights Act. Therefore, we are obligated to affirm the verdict and judgment of the trial court with regard to violation of the Equal Pay Act.