**Katuria E. SMITH, et al., Plaintiffs,**

v.

**The UNIVERSITY OF WASHINGTON LAW SCHOOL, et al., Defendants.**

No. C97–335z.

United States District Court,
W.D. Washington.

April 22, 1998.

Steven Amir Hemmat, Seattle, WA, for Katuria E. Smith, Angela Rock and Michael Pyle.

Katuria E. Smith, Seattle, pro se.

Michael J. Troy, Michael E. Rosman, Center for Individual Rights, Washington DC, for Katuria E. Smith, Angela Rock and Michael Pyle.

David J. Burman, Perkins Coie, Michael Madden, Bennett & Bigelow, Rebecca Elizabeth Todd, Attorney General's Office, Tort Claims Division, Seattle, WA, for Defendants.

## ORDER

ZILLY, District Judge.

THIS MATTER comes before the Court on the individual defendants' motion for partial summary judgment dismissing plaintiffs' monetary claims under 42 U.S.C. §§ 1981 and 1983 on the basis of qualified immunity (docket no. 51); the University of Washington School of Law's motion for summary judgment on plaintiffs' claims under Title VI (docket no. 58); the plaintiffs' motion for class certification (docket no. 24); and plaintiffs' motion to bifurcate the trial into class liability and individual damage phases (docket no. 26). The Court, having considered the motions, and all papers filed in support of and in opposition to the motions, and having heard oral argument on March 13, 1998, hereby makes the following rulings:

(1) The Court GRANTS in part and DENIES in part, without prejudice, the individual defendants' motion for partial summary judgment. The Court GRANTS the motion to the extent it seeks to dismiss all claims for damages under 42 U.S.C. §§ 1981 and 1983 against the individual defendants in their *official* capacity. Such claims are barred by the Eleventh Amendment. The motion is denied without prejudice in all other respects.

(2) The Court DENIES without prejudice the Law School's motion for partial summary judgment on the plaintiffs' Title VI claims. The Court cannot grant summary judgment on plaintiffs' Title VI claims without giving them an opportunity to conduct further discovery on defendants' admissions policy and its application.

(3) The Court GRANTS in part and DENIES in part the plaintiffs' motion for class certification. The Court GRANTS the motion to the extent the plaintiffs seek to certify a class on the issue of liability only and appoint Mr. Pyle as class representative. The Court concludes that a class action may be maintained under Rule 23(b)(2) for the sole purpose of determining whether the defendants discriminated against Caucasian applicants on the basis of race in violation of the Fourteenth Amendment. The class shall consist of all Caucasian applicants who applied to the Law School for class years commencing in 1994, 1995, 1996, 1997, and 1998, and were denied admission. The Court DENIES the motion to the extent plaintiffs seek to designate plaintiffs Smith and Rock as class representatives or to maintain a class for any damage claims. Damages vary with the individual applicant and are not suitable for class treatment. If the defendants are found to be liable, the Court will consider the damage claims of the named plaintiffs on an individual basis.

(4) The Court GRANTS the plaintiffs' motion to bifurcate the trial into class liability and individual damage phases.

## *Background*

Plaintiffs Katuria Smith, Angela Rock, and Michael Pyle applied to the University of Washington School of Law (the "Law School") for the 1994, 1995, and 1996 entering classes, respectively. During this time, according to defendants, the Law School's admissions policies and practices were materially unchanged. The Law School's admissions policy provides that the objective of Law School's admission program is:

to select individuals who have the highest potential for achievement in and contribution to the legal profession, legal scholarship, or law-related activities. The Law School has determined that this objective is best obtained by selection of individuals who have demonstrated the greatest capacity for high quality work at the Law School and who ... will contribute to the diversity of the student body and of the legally trained segment of the population.

Rosman statement, docket no. 63, Ex. 7. In measuring academic potential, the Law School relies primarily on undergraduate grade-point average ("GPA") and performance on the Law School Admission Test ("LSAT"), but the Law School will consider other factors including difficulty of the undergraduate program, attainment of advanced degrees, post-college experience, recommendations, and social or economic disadvantage that might have affected academic performance. *Id.* The admissions policy further states:

In selecting the entering class, the Law School does not make all of its admissions decisions on the basis of predicted aca-

demic performance. Important academic objectives are furthered by classes comprised of students having talents and skills derived from diverse backgrounds believed to be relevant to a rich and effective study of law. Factors that indicate this diversity include, but are not limited to, racial or ethnic origin, cultural background, activities or accomplishments, career goals, living experiences ..., or special talents. The list is not exhaustive, and the factors are not of equal weight; moreover, no single factor is dispositive. Furthermore, no factor will confer admission on an academically unqualified applicant.

*Id.*

Applicants to the Law School must submit undergraduate transcripts, LSAT scores, and a "personal statement" in which they are invited to describe how their experiences would contribute to the diversity of the Law School. Upon receipt of completed applications, the Law School uses an admission index, which is a weighted average of GPA and LSAT scores, to order the applicants. The admission index is an attempt to predict potential first year performance. Kummert Decl. at ¶ 5, attached as Ex. 2 to docket no. 36.

At all material times, the first step in the admissions process was to identify approximately 250 applications with the highest index scores. These were evaluated by the Law School's Admissions Coordinator, Kathy Swinehart, whose decisions were then reviewed by defendant Professor Richard Kummert, chair of the Law School's Admissions Committee. Kummert Decl., docket no. 52, ¶ 4. Ms. Swinehart reviewed the applications to determine whether the applicant's academic potential was as great as the index score tended to indicate and whether the applicant exhibited any of the diversity factors listed in the admissions policy. Thus, Ms. Swinehart evaluated all applicants in this group for both academic potential and their potential contribution to diversity. Applicants who lacked the academic potential or a diversity factor were either denied admission or referred to the Admissions Committee for review. All others in this group were admitted. *Id.*, Ex. 1, p. 11. *See also* Individual Defendants' Brief in Support of Summary

Judgment on §§ 1981–1983 Claims, docket no. 51, at 6.

In the next step in the admissions process, defendant Sandra Madrid, Assistant Dean for Admissions, reviewed the remaining applications. For the 1994 entering class, Dean Madrid initially set aside applications with index scores of 195 and 196 for review by the Admissions Committee, and then read all remaining files in their entirety. For 1995 and 1996, rather than sending any file to the Committee based on index score, Dean Madrid read all files other than those with the top 250 index numbers. In each year, she was authorized to admit, deny, or refer applicants to the Admissions Committee for further review. Her decisions were reviewed by Professor Kummert. In conducting their review, Dean Madrid and Professor Kummert considered both academic potential and diversity factors. *Id.* at ¶ 5.

Finally, the Admissions Committee, consisting of six faculty members and three students, reviewed the files referred to it. These included the files of applicants in the top 250 who were referred to the Committee by Kathy Swinehart, and files that were referred to the Committee by Dean Madrid and Professor Kummert. Sitting in groups of three, the committee members read each file and ranked the applicants on a scale from 3 to 15. *Id.* at ¶ 6. After ranking, additional offers of admission were made by Dean Madrid based on committee rankings. Offers of admission were made in numbers sufficient, based on relatively optimistic projected enrollment rates, to fill the 165 seats in an entering class. Applicants with good scores who were not initially offered admission were placed on the waiting list. *Id.* at ¶ 7.

In their motion for summary judgment, defendants provide statistics regarding the results of their admissions procedures, providing a breakdown by race. Individual Defendants' Motion for Partial Summary Judgment on § 1981 & § 1983 Damage Claims, docket no. 51, pp. 8–9. The Law School asserts that no racial quotas or targets were employed in the admissions process. Kummert Decl., docket no. 52, ¶ 8.

Only minimal discovery has taken place to date. *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Partial Summary

Judgment Motion (Qual.Imm.), docket no. 61, pp. 1, 9, 13. Plaintiffs have not yet had access to applicants' application files, and neither side has scheduled depositions. In addition, plaintiffs assert that the defendants have failed to disclose the basis for some of their admissions statistics.

Plaintiffs contend that race is not merely one of several diversity factors considered by the defendants in making admissions decisions, but rather a dispositive factor in many instances. Plaintiffs note that prior to 1989, the only diversity factors the Law School considered were race and ethnicity. Although the Law School changed its policy in 1989 to include other diversity factors, plaintiffs assert that the changes were cosmetic and made only to avoid a legal challenge. Citing memoranda that were circulated at the time the Law School changed its policy, plaintiffs maintain that the goals of the admissions system remained the same. Rosman Statement, docket no. 63, Ex. 8.

Plaintiffs offer various statistics they contend raise questions about the role of race in the Law School's admissions process. See Plaintiffs' Response, docket no. 61, pp. 8–10. In 1994, for example, nearly 79% of those admitted with index scores below a certain number (193) were racial minorities. Also in 1994, 100% of African–American applicants with GPAs between 2.5 and 3.24 and LSAT scores in the 155–159 range were admitted, while none of the 131 candidates identified as "white or other ethnicity" with comparative grades and scores were admitted. Plaintiffs contend that such statistics show that the Law School's preference for certain minorities is so significant as to be dispositive. Plaintiffs' Memorandum of Law in Opposition to Defendants' Partial Summary Judgment Motion (Qual.Imm.), docket no. 61, pp. 8–10.[1]

To further support their argument that race is often a dispositive factor in admissions, plaintiffs point out that the Law School follows the admissions guidelines of the University of Washington, which provide that "[a]ffirmative action will be taken to increase substantially the number of minority group members ... in educational programs where they have been traditionally underrepresented." Rosman statement, docket no. 63, Ex. 6. Plaintiffs also call attention to the Law School's membership in the Association of American Law Schools (the "AALS"). To maintain accreditation, a law school must fulfill the obligations of membership reflected in the AALS by-laws. These by-laws provide that a member school shall seek to have a faculty, staff, and student body which is diverse with respect to race, color and sex, while the school may seek other affirmative action objectives. Rosman Statement, docket no. 63, Ex. 10, AALS By-laws §§ 2–2 & 6–4(c). Plaintiffs offer a document prepared by the Law School for its reaccreditation inspection by the American Bar Association and the AALS, which took place on February 11 through 14, 1996. Kummert Decl. ¶ 2, attached as Ex. 2 to docket no. 36. The Law School asserts in that document that it maintains one of the most progressive and outstanding "minority admissions programs" in the nation. Rosman Statement, docket no. 63, Ex. 13. In addition, plaintiffs produce evidence that defendant Wallace Loh, prior to becoming Dean, had a specific goal of increasing the number of racial and ethnic minorities in the student body. Scully Decl., docket no. 62.

Finally, plaintiffs argue that defendants not only consider race to increase the diversity of the student body, but also to contribute to the diversity of the legal profession as a whole. To support their assertion, plaintiffs offer the Law School's admissions policy itself, which states that one of the Law School's goals is to "contribute to the diversity of ... the legally trained segment of the population." Rosman Statement, docket no. 63, Ex. 7.

The individual defendants now move for partial summary judgment on the basis of

---

1. Plaintiffs also offer an internal law school memorandum stating that Dean Madrid "read all of the files in the presumptive denial category. She admitted approximately 125 persons on grounds of contribution to ethnic diversity, and identified another 250 files that contained diverse experiences, background, education, etc." Rosman Statement, docket no. 63, Ex. 16, Memorandum re Structure of the Law School Admissions Process, p. 2. This internal memorandum was drafted in 1991, however, and the Law School counters that the procedure described in the memorandum was in effect in 1990–91 only. Kummert Supplemental Decl., docket no. 69, p. 5.

qualified immunity. The Law School moves to dismiss all claims against it under Title VI. Plaintiffs, for their part, move for class certification and for bifurcation of liability and damages issues.

*Discussion*

I. *Individual Defendants' Motion for Partial Summary Judgment Based on Qualified Immunity*

Plaintiffs bring claims for damages against the Law School under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, which prohibits any program or activity receiving federal financial assistance from discriminating on the basis of race, color, or national origin. The plaintiffs also bring claims for damages under 42 U.S.C. §§ 1981 and 1983 against Assistant Dean Sandra Madrid, Professor Richard Kummert, former Dean Wallace Loh, and Dean Roland Hjorth (collectively, the "individual defendants"), all of whom were involved in establishing or carrying out the Law School's admissions policy during the relevant time period. Plaintiffs seek declaratory and injunctive relief against all defendants.

The individual defendants now move to dismiss all claims for damages against them on qualified immunity grounds. Although the defendants do not specifically request any relief pursuant to the Eleventh Amendment, Eleventh Amendment immunity must be considered in addressing the plaintiffs' claims against the Law School and the defendants.

A. *Eleventh Amendment Immunity*

1. *Claims Against the Individual Defendants in Their Official Capacities*

▮ The Eleventh Amendment provides that the power of the federal judiciary "shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. This immunity extends to suits brought against a state by its own citizens. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984). A suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the state itself. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Thus, the Eleventh Amendment bars plaintiffs from bringing claims for damages against the state or its officials acting in their official capacities.

▮ Applying these principles, the individual defendants are immune from claims for damages brought against them under §§ 1981 [2] and 1983 in their official capacities. Thus, defendants' motion for summary judgment is granted to the extent it seeks to dismiss such claims.

The Law School also has Eleventh Amendment immunity with respect to any claims for damages brought under §§ 1981 and 1983, but the plaintiffs have not asserted such claims against the Law School. Plaintiffs' only claim for damages against the Law School is under Title VI. The Law School does not have Eleventh Amendment immunity with respect to Title VI claims because Congress has enacted a specific provision abrogating Eleventh Amendment immunity for such claims. *See* 42 U.S.C. § 2000d–7(a)(1).

---

2. Plaintiff argues, citing *Federation of African American Contractors v. City of Oakland,* 96 F.3d 1204 (9th Cir.1996), that they are not precluded from asserting claims for damages against the defendants in their official capacity under 42 U.S.C. § 1981. In order for there to be an abrogation of Eleventh Amendment immunity, however, Congress's intention to do so must be "unmistakenly clear in the language of the statute." *Dellmuth v. Muth,* 491 U.S. 223, 228, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989). No such

statement of intent appears in the language of § 1981. *See also Carmen v. San Francisco Unified Sch. Dist.,* 982 F.Supp. 1396 (N.D.Cal.1997) (noting that the Ninth Circuit is silent on the issue of whether there is abrogation of the Eleventh Amendment with regard to § 1981, but declining to hold that the Eleventh Amendment has been abrogated with respect to § 1981 claims). Thus, any claim for damages under § 1981 against the individual defendants in their official capacities should also be dismissed on Eleventh Amendment grounds.

### 2. Actions Against State Officers for Injunctive and Declaratory Relief

While the Eleventh Amendment precludes claims for damages against state officers in their official capacities, it does not preclude actions against such individuals for *injunctive or other prospective relief. Will,* 491 U.S. at 71 n. 10, 109 S.Ct. 2304. A suit for prospective injunctive relief provides "a narrow, but well-established, exception to Eleventh Amendment immunity." *Doe v. Lawrence Livermore Nat. Laboratory,* 131 F.3d 836, 839 (9th Cir.1997). Thus, plaintiffs' claims for injunctive and declaratory relief against the individual defendants in their official capacity remain.

### 3. Claims for Damages Against State Officers in their Personal Capacity

While the Eleventh Amendment immunity bars claims against state officials in their **official** capacity, it does not preclude claims for damages against officials in their **personal** capacity. Thus, plaintiffs may assert claims for damages against the individual defendants in their personal capacity.

### B. Qualified Immunity

Although the plaintiffs are not precluded from asserting claims for damages against the individual defendants in their personal capacities, the defendants are entitled to assert the defense of qualified immunity as to those claims. *Hafer v. Melo,* 502 U.S. 21, 29, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). The individual defendants argue that they are entitled to qualified immunity because they reasonably believed that their actions were in accordance with existing law.

### 1. The Qualified Immunity Standard

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). When governmental officials abuse their office, actions for damages may offer the only realistic avenue for vindication of constitutional guarantees. Permitting damages suits against governmental officials, however, can entail social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The purpose of qualified immunity is to accommodate these conflicting concerns by shielding government officials performing discretionary functions from civil damages "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.* The *Harlow* standard "gives ample room for mistaken judgments," *Malley v. Briggs,* 475 U.S. 335, 344, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), and "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Id.* at 341, 106 S.Ct. 1092.

Analysis of a qualified immunity claim involves three steps: (1) identifying the specific right allegedly violated; (2) determining whether the right was so clearly established as to alert a reasonable officer to its constitutional parameters; and (3) determining whether a reasonable public officer could have believed that the particular conduct at issue was lawful. *Gabbert v. Conn.* 131 F.3d 793, 799 (9th Cir.1997). The plaintiff must identify the specific right allegedly violated, and bears the burden of showing that the right allegedly violated was clearly established. If the plaintiff demonstrates that the right allegedly violated was clearly established, the court must then consider whether a reasonable official could have believed the conduct at issue was lawful under that clearly established law. The defendant bears the burden of showing that a reasonable official could have believed that the conduct was lawful. *Id.* at 800–02.

A right is clearly established if the only reasonable conclusion from controlling precedent is that the disputed right exists. *Id.* at 801; *Blueford v. Prunty,* 108 F.3d 251, 254–55 (9th Cir.1997). "The contours of the right must be sufficiently clear that [at the time the allegedly unlawful action is taken] a reasonable official would understand that what he is doing violates that right." *Mendoza v. Block,* 27 F.3d 1357, 1361 (9th Cir. 1994) (quoting *Anderson,* 483 U.S. at 640).

 Whether an asserted federal right was clearly established at a particular time is a question of law. *Elder v. Holloway,* 510 U.S. 510, 516, 114 S.Ct. 1019, 1023, 127 L.Ed.2d 344, 351 (1994). In determining whether a right is clearly established, the court should consider federal case law and other relevant precedents. Precedent directly on point is not necessary to demonstrate a clearly established right, however. If the only reasonable conclusion from relevant authority was that the disputed right existed, the defendant would be on notice of the right, even if no case had specifically so held. *Blueford,* 108 F.3d at 255. Thus, plaintiff need not show that the alleged acts have been previously held unconstitutional; it is sufficient if the unlawfulness was apparent in light of preexisting law.

 In the absence of binding precedent, a court should look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts. *Malik v. Brown,* 71 F.3d 724, 727 (9th Cir.1995).[3] In determining whether a right is clearly established, courts must be mindful that "an official cannot be expected to predict the future course of constitutional law." *Procunier v. Navarette,* 434 U.S. 555, 562, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), *abrogation on other grounds recognized by Broderick v. Roache,* 996 F.2d 1294 (1st Cir. 1993). Accordingly, a court should ask whether the governmental officials "acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable interpretation ... can be constructed ... after the fact." *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).

 Because qualified immunity is an immunity from suit rather than a mere defense to liability, the Supreme Court has repeatedly emphasized the importance of resolving immunity questions at the earliest possible stage in litigation. *Id.* at 227, 112 S.Ct. 534

(citations omitted). Nevertheless, under certain circumstances discovery tailored specifically to the question of qualified immunity may be necessary before a court can decide a motion for summary judgment on qualified immunity grounds. *Anderson,* 483 U.S. at 646 n. 6, 107 S.Ct. 3034.

### 2. *Application*

 The threshold question in the qualified immunity analysis is whether plaintiffs have identified a specific right allegedly violated by the defendants. The plaintiffs' allege that they have a right under the equal protection clause of the Fourteenth Amendment not to be discriminated against by a state educational institution on the basis of race. Plaintiffs claim their right was violated because the defendants used different admissions standards for "favored racial groups," consisting of minority applicants, than for "disfavored" racial groups, consisting of nonminority applicants. The Court concludes that plaintiffs have identified a specific right allegedly violated by the defendants.

Having identified a specific right at issue, the Court must consider whether the contours of that right were sufficiently clear that at the time of the allegedly unlawful action the defendants would have understood that what they were doing violated that right. Defendants argue that the specific aspects of the Law School's admissions program challenged by the plaintiffs are not prohibited by any clearly established law. Defendants contend that there is no clearly established law precluding the Law School from using its plan to achieve diversity in the legal profession, or from according greater weight to race than to other diversity factors, or from making decisions about minority candidates at a different time than decisions about nonminority candidates. Additionally, defendants maintain that at all material times they followed a "Harvard Plan" of admissions, which has been held constitutional under established law. A "Harvard Plan" is an ad-

---

**3.** Plaintiffs cite *Hallstrom v. City of Garden City,* 991 F.2d 1473, 1483 (9th Cir.1993), *cert. denied sub nom.,* 510 U.S. 991, 114 S.Ct. 549, 126 L.Ed.2d 450 (1993), for the proposition that state court cases are irrelevant for purposes of determining whether the law is clearly established.

The lesson of *Hallstrom,* however, is that, for purposes of determining whether the law is clearly established, a defendant cannot rely on the holdings of district courts when controlling circuit and Supreme Court precedent clearly establish that the law is otherwise.

missions plan that considers race as one of several diversity factors, and allows race to be considered a "plus" factor as long as all applicants are placed on the same footing for consideration. *See Regents of the University of California v. Bakke,* 438 U.S. 265, 316–19, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978).

Defendants read the plaintiffs' claims too narrowly. The plaintiffs claim that race was used as a determinative, rather than a "plus," factor in the admissions process; that the defendants used different standards for considering minority and nonminority applicants; and that nonminority and minority applicants were placed on unequal footing with respect to consideration for admission. As to these particular claims, there is clearly established law under which the defendants could evaluate the constitutionality of their conduct.

There is binding Supreme Court and Ninth Circuit authority which clearly establishes guidelines for implementing and carrying out race-conscious programs. In *Bakke,* Justice Powell established certain standards for considering race or ethnicity in a graduate admissions program.[4] First, there must be a compelling state interest that justifies the consideration of race by the institution. "Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake," which the Constitution forbids. *Id.* at 307, 98 S.Ct. 2733. Moreover, helping certain groups the school has identified as victims of "societal discrimination" does not justify the consideration of race or ethnic background in the admissions process. *Id.* at 310. The attainment of a diverse student body, however, is a compelling interest and constitutionally permissible goal for a university or graduate program. *Id.* at 311–12. Thus, an institution of higher education may take race into account in achieving "educational diversity."

*Id.* at 316. Educational diversity "encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element." *Id.* at 315. Race or ethnic background, like other educational diversity factors, may be deemed a "plus" in a particular applicant's file, yet it should not insulate the individual from comparison with all other candidates for the available seats. Each applicant should be treated as an individual in the admissions process, and the admissions program should be "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight." *Id.* at 317. The Harvard plan of admissions, appended to the opinion of Justice Powell, represented an admissions program that considered race in a manner consistent with constitutional requirements.

In *Higgins v. City of Vallejo,* 823 F.2d 351 (9th Cir.1987), *cert. denied,* 489 U.S. 1051, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989), the Ninth Circuit upheld the promotion of an African American male under the City's affirmative action plan in part because the City's plan was similar to the "Harvard Plan" approved in *Bakke.* The Ninth Circuit noted that in city promotion decisions, all candidates compete on equal footing. Moreover, the city manager had discretion to choose among the top candidates, using various factors, including race, to make his decision. Thus, race was merely one of several factors that could be considered a "plus" in the decision making process.

Although not binding authority, several state court opinions have adopted Justice Powell's views in *Bakke* during the period the Law School was applying its admissions

---

4. Justice Powell, writing only for himself, announced the judgment of the Court. The plaintiffs concede for purposes of this motion only that Justice Powell's opinion may be considered the rationale for the holding of the entire Court in *Bakke,* and that state actors may consider race for the non-remedial reasons set forth in that opinion. *Se* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Qual.Imm.) at 16. Other courts have approved and adopted Justice Powell's analysis in *Bakke. See Mc-*

*Donald v. Hogness,* 92 Wash.2d 431, 439–40, 598 P.2d 707 (1979), *cert. denied sub nom.,* 445 U.S. 962, 100 S.Ct. 1650, 64 L.Ed.2d 238 (1980); *University & Community College Sys. of Nevada v. Farmer,* 113 Nev. 90, 930 P.2d 730 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1186, 140 L.Ed.2d 317 (1998); *DeRonde v. Regents of the Univ. of Cal.,* 28 Cal.3d 875, 172 Cal.Rptr. 677, 625 P.2d 220 (1981), *cert. denied,* 454 U.S. 832, 102 S.Ct. 130, 70 L.Ed.2d 110 (1981).

policies. *See McDonald v. Hogness,* 92 Wash.2d 431, 439–40, 598 P.2d 707 (1979), *cert. denied sub nom.,* 445 U.S. 962, 100 S.Ct. 1650, 64 L.Ed.2d 238 (1980); *University & Community College Sys. Of Nevada v. Farmer,* 113 Nev. 90, 930 P.2d 730 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1186, 140 L.Ed.2d 317 (1998); *DeRonde v. Regents of the Univ. of Cal.,* 28 Cal.3d 875, 172 Cal. Rptr. 677, 625 P.2d 220 (1981), *cert. denied,* 454 U.S. 832, 102 S.Ct. 130, 70 L.Ed.2d 110 (1981).

Although *Bakke* established several guidelines for race-conscious admissions programs, there are certain matters as to which there is no clearly established law. There is no clearly established law on the issue of whether the attainment of diversity in the legal profession is a goal that justifies the consideration of race in law school admissions. It is also not clearly established whether the presence of mixed motives and interests, some constitutionally sufficient and some not, renders a race-conscious admissions program unconstitutional as a whole. *Bakke* has made clear, however, that there must be at least one constitutionally proper justification for considering race in admissions, and that the program must be narrowly tailored to serve *that* interest. Thus, to the extent a program is tailored to serve a state interest that is not compelling, rather than one that is, the program would be unconstitutional. The unresolved question is whether a program is constitutional if it is tailored to serve both a constitutional and unconstitutional goal, and it in fact serves both goals. That the question of mixed motives is unresolved does not entitle the defendants to qualified immunity at this time, however. As discussed in the third step of the analysis, the Court is unable to make a qualified immunity determination based on the current factual record.

The third step in the qualified immunity analysis is to consider whether a reasonable official could have believed the conduct at issue was lawful under clearly established law. The defendants argue that they have implemented and applied a "Harvard Plan" of admissions, and a Harvard Plan is constitutional under clearly established law. As-suming defendants have adopted a Harvard plan and followed that plan in making its admissions decisions, the defendants would be entitled to qualified immunity. The Court is unable to determine at the present time, however, whether the defendants have in fact followed a Harvard plan.

Although the defendants have made representations concerning what their admissions policy is, how it was carried out, and what the goals of the program are, the plaintiffs have not yet had an opportunity to conduct discovery and challenge the defendants' representations.[5] Plaintiffs have offered in opposition to the motion statistical evidence showing that in 1994 nearly 79% of those admitted with index scores below 193 were racial minorities. In that same year, all African-American applicants with GPAs between 2.5 and 3.24 and LSAT scores in the 155–159 range were admitted, while none of the 130 or so candidates identified as "white or other ethnicity" with comparative grades and scores were admitted. The Court cannot grant summary judgment on qualified immunity without giving plaintiffs an opportunity to conduct further discovery on defendants' admissions policy and its application.

Defendants' motion for summary judgment on qualified immunity is DENIED without prejudice.

## II. Defendants' Motion for Summary Judgment on Title VI Claim.

Plaintiffs have asserted a claim against the University of Washington Law School under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, which prohibits any program or activity receiving federal financial assistance from discriminating on the basis of race, color, or national origin. Defendant moves for summary judgment dismissing plaintiffs' Title VI claim. Defendant argues that (1) Title VI was enacted pursuant to Congress's spending power; (2) obligations imposed under the spending power must be unambiguous so that the recipient is put on notice of the conditions it is accepting when it receives federal funds; (3) damages are

---

5. As of the date of oral argument, the plaintiffs had not yet reviewed any of the admissions files or taken any depositions of admissions officers.

awardable under Title VI only for **intentional** violations of those conditions; (4) the Law School enacted a "Harvard plan" for admissions, which has been approved in *Bakke* and authorized by the Office of Civil Rights; and (5) because the Law School followed a plan that satisfied *Bakke* and the OCR, there can be no intentional violation of an unambiguous term of Title VI.

### A. Title VI

 Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d, provides in pertinent part that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial aid." To state a claim for damages under 42 U.S.C. § 2000d, a plaintiff must allege (1) that the entity involved is engaging in racial discrimination; and (2) the entity involved is receiving federal financial assistance. *Fobbs v. Holy Cross Health System Corp.*, 29 F.3d 1439, 1447 (9th Cir.1994), *cert. denied*, 513 U.S. 1127, 115 S.Ct. 936, 130 L.Ed.2d 881 (1995). Although intent must be proven at trial, the plaintiff need not plead intent in his complaint. *Id.*

#### 1. Spending Clause

In *Pennhurst State School & Hosp.*, 451 U.S. at 17, 101 S.Ct. 1531, the Supreme Court described statutes enacted pursuant to the Spending Clause, U.S. Const. art. I, § 8, cl. 1, as contracts:

[O]ur cases have long recognized that Congress may fix the terms on which it shall disburse federal money to the States. Unlike legislation enacted under § 5 [of the Fourteenth Amendment], however, legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of the Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of

the "contract." There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously. By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation.

(Internal citations omitted).

 The Law School argues that the Supreme Court established in *Guardians Ass'n v. Civil Service Comm'n*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), that Title VI was enacted pursuant to Congress's spending power. Because Title VI is a Spending Clause statute, defendant argues, it cannot be held liable unless the obligations or conditions imposed by its contract with the government are stated unambiguously. Plaintiff counters that there was no majority holding in *Guardians*, and other courts have held that Congress enacted Title VI pursuant to section 5 of the Fourteenth Amendment. As a result, spending power limitations do not apply.

The plaintiff is correct that no opinion commanded a majority in *Guardians*, but the analysis applied by at least five of the justices suggests that they agreed that Title VI was enacted pursuant to the Spending Clause. Justice White, joined by Justice Rehnquist, stated specifically that Title VI was a Spending Clause statute. *Id.*, 463 U.S. at 599, 103 S.Ct. 3221. Justices Stevens, Blackmun, and Brennan seemed to accept in their analysis that Title VI was spending power legislation. *Id.* at 636–38 (dissenting opinion).[6] Plaintiffs cite a Second Circuit case, *United States v. Yonkers Bd. of Educ.*, 893 F.2d 498, 503 (2nd Cir.1990), in support of their argument that Title VI was enacted pursuant to § 5 of the Fourteenth Amendment, but that case actually held that Congress had authority under § 5 to eliminate Eleventh Amendment immunity in cases

---

6. Two circuit courts have also concluded that at least five of the justices held that Title VI was enacted pursuant to the Spending Clause. *See Rowinsky v. Bryan Independent School Dist.*, 80 F.3d 1006, 1012 n. 14 (5th Cir.), *cert. denied*, —

U.S. ——, 117 S.Ct. 165, 136 L.Ed.2d 108 (1996); *Davis v. Monroe County Bd., of Educ.*, 120 F.3d 1390, 1398 (11th Cir.1997), *petition for cert. filed*, 66 USLW 3387 (Nov 19, 1997).

brought under Title VI. The court did not hold that Title VI itself was enacted pursuant to § 5. The Court concludes for the reasons stated in Justice White's opinion in *Guardians* that Title VI is a spending power statute.

### B. *Liability for Damages under Title VI*

■■ Compensatory relief under Title VI requires a showing that defendants intentionally discriminated in violation of the statute. *Guardians*, 463 U.S. at 602–03, 103 S.Ct. 3221 (White, J.) ("[C]ompensatory relief, or other relief based on past violations of the conditions attached to the use of federal funds, is not available as a private remedy for Title VI violations not involving intentional discrimination."); *Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 70, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (Title IX case) (monetary damages not permitted for unintentional violations because the recipient of federal funds lacks notice that it will be liable for a monetary award; this notice problem does not arise where intentional discrimination is alleged); *Ferguson v. City of Phoenix*, 931 F.Supp. 688, 697 (D.Ariz.1996) (post-*Franklin* cases have uniformly held that compensatory damages under Title VI are available only for intentional violations of the act).

The Law School argues that it cannot be held liable under Title VI because (1) it engaged in conduct consistent with *Bakke* and OCR rulings, (2) it did not have "unambiguous notice" that its admissions program was discriminatory, and (3) any violation would be unintentional. Defendant's summary judgment motion turns on its argument that it followed existing law, specifically *Bakke* and OCR rulings, concerning the consideration of race as a factor in admissions. As noted earlier, however, the Court does not have a sufficient factual record to determine the role race played in the admissions process and whether the Law School com-

plied with controlling law in carrying out its admissions policy. Until the Court has a fuller factual record before it, it cannot determine whether the Law School intentionally discriminated against certain students based on race.

In seeking dismissal of the plaintiffs' Title VI claim, the Law School relies substantially on, and incorporates by reference, the qualified immunity motion of the individual defendants. Like the individual defendants, the Law School argues that its conduct was consistent with *Bakke* and thus it reasonably believed it was complying with existing law. The Court may determine at a later date that there is no basis for finding that defendant intentionally discriminated against the plaintiffs, but it cannot do so on the present record. Accordingly, the Court DENIES without prejudice the Law School's motion for summary judgment on the Title VI claims.

### III. *Motion for Class Certification*

In their motion for class certification, plaintiffs state that they "seek to maintain this class pursuant to Rule 23(b)(2) on the issue of whether defendants engaged in unlawful discrimination and whether they should be enjoined from engaging in such discrimination in the future.[7] Alternatively, plaintiffs seek to maintain an action under Rule 23(b)(3) on the issue of whether defendants engaged in unlawful discrimination." Memorandum in support of motion for class certification, docket no. 35 at 1.

Defendants oppose class certification on numerous grounds. They argue first that none of the plaintiffs have standing to challenge the Law School's admissions policy. In addition, they argue that class treatment is inappropriate because none of the requirements of Rule 23(a) are satisfied, and plaintiffs cannot satisfy Rule 23(b)'s requirement that common issues predominate over individual issues. Finally, defendants argue that

---

**7.** In their Consolidated Amended Complaint, plaintiffs state that they seek to maintain a class action pursuant to Rules 23(b)(3) and 23(c)(4) on the issue of whether defendants engaged in unlawful discrimination. According to the Complaint, plaintiff Pyle seeks to represent a subclass, pursuant to Rule 23(b)(2) and 23(c)(4), of all those who have applied for admission to the

University of Washington Law School, were denied admission, and still desire to attend the Law School. Plaintiffs' counsel clarified at oral argument that the request for class certification the Court should consider is the one made in the motion for class certification: certification of a class under Rule 23(b)(2) seeking injunctive and declaratory relief.

certification should be denied under the doctrine of necessity.

## A. *Standing*

As a preliminary matter, defendants challenge each plaintiff's standing to bring this suit. Standing is not merely a pleading requirement, but an indispensable part of the case, and must be established by evidence appropriate for every stage of litigation. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In considering a motion for class certification, the Court should not make a preliminary determination of the merits of the action. *Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Indeed, "[t]he court is bound to take the substantive allegations of the complaint as true." *Blackie v. Barrack,* 524 F.2d 891, 901 n. 17 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976).

The standard for determining whether a plaintiff has standing contains three elements:

> First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) "actual or imminent, not 'conjectural' or 'hypothetical,' " .... Second there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." ... Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Defenders of Wildlife,* 504 U.S. at 560–61, 112 S.Ct. 2130 (citations omitted).

Defendants argue that plaintiffs Smith and Pyle lack standing because they had no realistic chance of admission to the Law School.[8] Defendants, relying on *Rothblum v. Board of Trustees of College of Medicine & Dentistry of New Jersey,* 474 F.2d 891, 899 (3d Cir.1973), contend that because Smith and Pyle would not have been admitted in any event, they cannot show a likeli-

hood that the Law School's rejection of their applications for admission would be redressed if the alleged illegality of the admissions process were corrected. The Court rejects defendants' argument, both because it requires the Court to make an inquiry into the merits of this action, which would be inappropriate at this stage of the proceedings, and because it does not reflect the current state of the law.

Plaintiffs challenging state action on equal protection grounds are not required to demonstrate that they would have received a benefit absent application of a discriminatory policy. In *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville,* 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993), the Supreme Court explained:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

*See also Monterey Mechanical Co. v. Wilson,* 125 F.3d 702, 708 (9th Cir.1997) (to establish standing to challenge a statutory requirement that general contractors for state university subcontract percentage of work to minority and women-owned subcontractors, bidders "need only show that they are forced to compete on an unequal basis" and that being forced to compete on an unequal basis because of race (or sex) is an injury under the Equal Protection Clause). Thus, plaintiffs Smith and Pyle need not allege that they would have been admitted to the Law School in order to establish standing in this case. They need only allege that the Law School has erected a barrier that made it more difficult for members of one group to obtain a benefit than for members of another group. Plaintiffs have done so in this case.[9]

---

**8.** Defendants do not make this argument with respect to Rock.

**9.** The Court finds unpersuasive the defendants' argument that *Northeastern Florida Chapter of*

Defendants also argue that Smith and Rock lack standing to seek *injunctive* relief because they have attended or are attending law school elsewhere, and thus face no future harm from the Law School's admissions policy and practices. It is well established that "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (quoting *O'Shea v. Littleton,* 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). Applying that rule, the Supreme Court has held that plaintiffs do not have standing for injunctive relief if they are unable to establish that they are likely to suffer future injury from the challenged conduct. *Id.* Because Smith and Rock will not be reapplying for admission to the Law School's J.D. program, they are not at risk of future harm from the Law School's allegedly discriminatory admissions program.[10] Thus, *Lyons* would appear to foreclose their claims for injunctive relief. The Ninth Circuit has established, however, an exception to the general rule stated in *Lyons.*

In *Smith v. City of Fontana,* 818 F.2d 1411, 1423 (9th Cir.), *cert. denied,* 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987), the Ninth Circuit held that plaintiffs need not allege a credible threat of future injury in order to seek injunctive relief as long as they also have a claim for damages involving the same operative facts and legal theory. In a recent case, *Nava v. City of Dublin,* 121 F.3d 453, 456 (9th Cir.1997), the Ninth Circuit examined the history of its exception to *Lyons,* and restated the rule as follows:

[O]nce a plaintiff establishes standing to seek damages, a court need not undertake a separate standing inquiry for equitable relief so long as the damages and equitable claims are predicated on the same operative facts and legal theories.

The *Nava* court applied the exception "with reservation," however, and noted that several Ninth Circuit decisions have impliedly declined to apply the rule that a claim for damages confers a claim for injunctive relief if predicated on the same operative facts. *See id.* at 457–58 (citing *O'Neal v. City of Seattle,* 66 F.3d 1064, 1066 (9th Cir.1995); *Thomas v. County of Los Angeles,* 978 F.2d 504, 507–08, 511 (9th Cir.1992); *Imagineering, Inc. v. Kiewit Pacific Co.,* 976 F.2d 1303, 1306–09 (9th Cir.1992), *cert. denied,* 507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993); *Nelsen v. King County,* 895 F.2d 1248, 1249–55 (9th Cir.1990); *The Presbyterian Church (U.S.A.) v. United States,* 870 F.2d 518, 528–29 (9th Cir.1989)). Despite its reservations, the *Nava* court held that a faithful interpretation of the Ninth Circuit cases creating the exception to *Lyons* required the court to apply that exception. *Id.* at 456. This Court is also required to follow existing Ninth Circuit law.

Plaintiffs Smith and Rock have standing to bring their claim for damages, and their claim for prospective relief is predicated on the same operative facts and legal theory as their claim for damages. Under *Nava,* therefore, these plaintiffs have standing to seek injunctive and declaratory relief. That these plaintiffs have standing to seek prospective relief, however, does not resolve the question of whether injunctive and declaratory relief is in fact available to Smith and Rock. In *Nava,* the court held that, while the plaintiffs had standing to bring a claim for

---

*Associated General Contractors* is inapposite because that case involved minority set aside programs. There is no basis for concluding that the standing analysis in a class action asserting equal protection claims varies according to the label attached to the challenged program. In *Bras v. California Public Utilities Comm'n,* 59 F.3d 869, 874–75 (9th Cir.1995), *cert. denied,* 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 748 (1996), the court rejected a claim that plaintiff lacked standing to bring an equal protection challenge because the program in question established "goals" rather than "quotas." *See also Hopwood v. Texas,* 861 F.Supp. 551, 568 (W.D.Tex.1994) (rejecting argument that *Northeastern Florida*

*Chapter of Associated General Contractors* applies only to specific set-aside programs), *reversed on other grounds,* 78 F.3d 932 (5th Cir.), *cert. denied,* 518 U.S. 1033, 116 S.Ct. 2581, 135 L.Ed.2d 1095 (1996). There is sufficient nexus between the Law School's admissions policy statement and the claimed injury for plaintiffs to have standing in this case.

10. Plaintiffs Rock and Smith have argued that they may face future injury if they apply to the Law School's LL.M. program. The Court finds that argument without merit. It is undisputed that the admissions criteria for the J.D. program and the LL.M. program are different.

prospective relief, they could not obtain such relief:

> *Lyons* precludes the issuance of an injunction where ... a plaintiff's standing to seek the injunction is predicated on the existence of an accompanying damages claim and there has been no individualized showing of likely future harm to the plaintiff. . . .
>
> . . . . Although a plaintiff can *seek* an injunction on the basis of her standing to seek' damages, there likely is no set of circumstances in which she would be able to *obtain* one.

*Id.* at 460. The inability of Smith and Rock to obtain prospective relief has no bearing on the threshold issue of standing, but must be considered in determining whether Smith and Rock meet the typicality, commonality, and adequacy of representation requirements of Rule 23(a) with respect to any class seeking prospective relief.

### B. *Requirements for Class Certification*

■■■ In order to maintain a class action, a plaintiff must meet all the requirements of Rule 23(a) and satisfy the criteria in at least one of the categories in Rule 23(b). According to plaintiffs' motion for class certification, they seek to certify a class under Rule 23(b)(2). Class actions under (b)(2) are proper if "final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate." Rules Advisory Committee Notes on (b)(2). Plaintiffs maintaining a (b)(2) class action are not precluded from seeking money damages, but their claim for money damages must be incidental to their primary claim for injunctive relief. *Probe v. State Teachers' Retirement System,* 780 F.2d 776, 780 (9th Cir.), *cert. denied,* 476 U.S. 1170, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986). Because the plaintiffs request certification under Rule 23(b)(2), the Court will consider the requirements of 23(a) as they relate to that particular type of class.

### 1. *Rule 23(a) Requirements of the Injunctive Class*

Rule 23(a) requires that (1) the class be so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Defendants challenge each requirement of 23(a), arguing that plaintiffs have failed to show numerosity, commonality, typicality, or adequacy of representation.

### *Numerosity*

■■ Rule 23(a)(1)'s numerosity requirement does not demand that the class be so numerous that joinder is impossible but rather simply that joinder of the class members is impracticable. *Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909, 913 (9th Cir.1964). Whether joinder would be impracticable depends on the facts and circumstances of each case and does not, as a matter of law, require any specific minimum number of class members. *Arnold v. United Artists Theatre Circuit, Inc.,* 158 F.R.D. 439, 448 (N.D.Cal.1994).

Plaintiffs' motion for class certification provides that they seek to certify under Rule 23(b)(2) a class of all students from disfavored racial and ethnic groups who applied for admission to the Law School for academic years commencing in 1994, 1995, 1996, 1997, and 1998 and were denied admission. The plaintiffs also seek to include in the class applicants from disfavored classes who apply for admission in subsequent years until the date judgment is entered. Plaintiffs have failed to identify any group, other than Caucasians, that they believe were treated less favorably than minority groups. Accordingly, the Court will consider only Caucasians in determining the number of potential class members.

■■ The evidence demonstrates that the number of Caucasian applicants who applied to the Law School for school years commencing in 1994, 1995, and 1996, and were denied admission is in the thousands. Exhibits 17, 18, and 19 show, for example, that 1442 Caucasian applicants were denied admission in 1994, 1293 Caucasian applicants were denied admission in 1995, and 1049 Caucasians were denied admission in 1996. The plaintiffs also seek to include in their class Caucasians who applied for admission to the Law School for class years commencing in 1997 and 1998, as

well as Caucasians who apply in future years.[11] This would increase substantially the number of persons included in the class. Although the identity of applicants to the Law School for past and current years is known, joinder of the class members described above would be impracticable.

The defendants argue that the proposed class is both indefinite and overbroad. They contend that the Court should exclude from the numerosity determination all Caucasian applicants who had no realistic chance of being admitted, as well as any Caucasian applicants who have attended law school elsewhere. Defendants argue that applicants who would not have otherwise been admitted do not have any damages, and applicants who attended other law schools have no standing to seek injunctive relief. Because the number of unqualified Caucasian applicants and the number of applicants who went on to attend other law schools are unascertainable at the present time, the defendants urge the Court to find that the numerosity requirement is not satisfied.

■ The Court rejects the defendants' argument concerning allegedly unqualified applicants for several reasons. First, that argument requires the Court to make a inquiry into the merits of the plaintiffs' claims, which is prohibited at this stage of the proceedings. *Blackie,* 524 F.2d at 901. Additionally, it presupposes a standing requirement for the plaintiffs that simply does not exist. Plaintiffs need not demonstrate in an equal protection case that they would have been admitted absent the discriminatory policy. *See Northeastern Florida Chapter of the Associated General Contractors of America,* 508 U.S. at 666, 113 S.Ct. 2297; *Monterey Mechanical Co.,* 125 F.3d at 708. Finally, there is no requirement that every potential class member must have suffered a cognizable injury. " 'A class may be certified even though the initial definition includes members who have not been injured or do not wish to pursue claims against the defendant.' " *National Organization for Women, Inc. v. Scheidler,* 172 F.R.D. 351, 357 (N.D.Ill.1997) (quoting *Elliott v. ITT Corp.,*

150 F.R.D. 569, 575 (N.D.Ill.1992)). The focus in a(b)(2) class is on the defendants' conduct. Here, plaintiffs have alleged in their complaint that defendants engaged in unlawful discrimination that has injured all the members of the proposed class in the same general fashion. That the proposed class members allegedly suffered discrimination at the hands of the defendants is sufficient to include them in any (b)(2) class.

■ Defendants' argument that the only plaintiffs that should be included in the (b)(2) class are those who have not yet attended law school is a variation of their standing argument. Defendants contend that applicants who have attended other law schools would be seeking primarily damages, as opposed to prospective relief, thereby making them unsuitable members of any (b)(2) class. The Court rejects this argument. The Court is not required to determine whether every putative class member would have standing to assert his or her claims. The focus is instead on the named plaintiffs in a class action. At least one *named* plaintiff in a putative class action must satisfy the standing requirement in order to seek relief on behalf of himself or the class. *Casey v. Lewis,* 4 F.3d 1516, 1519 (9th Cir.1993). Under *Nava,* all three of the named plaintiffs have standing to bring claims for injunctive and declaratory relief. Moreover, the proper inquiry for determining whether a(b)(2) class should be certified is not whether each class member seeks primarily injunctive and declaratory relief, but rather whether the predominant claim in the action itself is for prospective relief. Plaintiffs' complaint makes clear that any claims for damages, which would need to be proven individually, are secondary to the plaintiffs' claim for injunctive and declaratory relief.

Plaintiffs have satisfied the numerosity requirement of Rule 23(a). Any class certified under Rule 23(b)(2) would include all Caucasian applicants who applied to the Law School for class years commencing in 1994, 1995, 1996, 1997, and 1998, and were denied admission.

---

11. The fact that a class includes future members does not render the class definition so vague as

to preclude certification. *Probe,* 780 F.2d at 780.

### Common Questions of Law or Fact

■■■ Rule 23(a)(2) requires that there be a common question of law or fact among the members of the class. The commonality requirement is satisfied "where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated." *Yslava v. Hughes Aircraft Co.*, 845 F.Supp. 705, 712 (D.Ariz.1993). "Subpart (a)(2)'s requirement that there be questions of law common to the class is 'met by the alleged existence of common discriminatory practices. The actions of the defendant need not affect each member of the class in the same manner.'" *Arnold*, 158 F.R.D. at 448 (quoting *Walthall v. Blue Shield of Calif.*, 16 Fair. Empl. Prac. Cas. (BNA) 626, 628, 1977 WL 34 (N.D.Cal.1977)). The common question of law in the proposed (b)(2) class is whether the Law School's consideration of race in its admissions process violated the equal protection clause of the Fourteenth Amendment. Common factual matters include whether race and ethnicity were considered in such a manner as to place Caucasian applicants on unequal footing with minority applicants.

Defendants contend that plaintiffs cannot meet the commonality requirement of Rule 23(a) because there is no "across the board" discriminatory treatment of the so-called "disfavored" groups in the admissions process. They argue that even if one applicant could establish that he or she was denied admission because of his or her race, there would be no basis for finding that the Law School discriminated against another applicant in a similar fashion. Defendants' argument is more appropriately considered in the context of assessing the individual plaintiffs' damages, rather than in the context of determining whether there are common issues or claims that are amenable to class treatment. Plaintiffs' core claim is that certain groups of applicants were subjected to different standards and criteria for admission based solely on their race or ethnicity. The question that is common to the putative classes as a whole is whether the defendants intentionally discriminated against Caucasian applicants on the basis of race in violation of the Fourteenth Amendment. The common injury would be the constitutional one: the denial of

equal treatment under the law. That some plaintiffs may have incurred greater damages than others is relevant to damages but immaterial to the central constitutional claim that forms the basis of any liability. "The amount of damages is invariably an individual question and does not defeat class action treatment." *Blackie*, 524 F.2d at 905.

### Typicality

■■■ Subpart (a)(3) requires that the claims or defenses of the proposed class representatives be ones that are typical of the claims or defenses of the class they seek to represent. Typicality has been interpreted to mean that "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 156, 102 S.Ct. 2364, 2370, 72 L.Ed.2d 740 (1982) (quoting *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977)). The claims of the named plaintiffs need not be identical to the claims of the class. They need only "arise from the same remedial and legal theories." *Arnold*, 158 F.R.D. at 449. When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually satisfied, irrespective of varying fact patterns which underlie individual claims. *Newberg* § 3.13 at 3–77 and Supp.; *Robidoux v. Celani*, 987 F.2d 931, 936 (2nd Cir.1993). "[T]ypicality turns on the defendant's actions toward the plaintiff class, not particularized defenses against individual class members." *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir.1996). In cases alleging racial, ethnic, or sex discrimination, typicality is satisfied if the named plaintiffs allege that the defendant discriminated against them in the same general fashion as against the other members of the class. *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 598 (2nd Cir. 1986).

According to the allegations in the plaintiffs' complaint, all three of the named plaintiffs allege that the defendants discriminated against them in the same general fashion by applying different standards and criteria of

admission to Caucasians than to applicants of other races. The claims of the three named plaintiffs arise out of the same course of discriminatory conduct that gives rise to the claims of the other class members and are based on the same legal theory. Accordingly, the typicality requirement of Rule 23(a) is satisfied in this case.

### Adequacy of Representation

■ Rule 23(a)(4) requires that the representative parties will fairly and adequately protect the interests of the class. This requirement is determined pursuant to a two-pronged test. First, the representative parties must appear able to prosecute the action vigorously through qualified counsel. Secondly, the representatives must not have antagonistic or conflicting interests with the unnamed members of the class. *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir.1978).

With respect to the first prong, plaintiffs assert that their counsel have experience in civil rights litigation and have successfully prosecuted civil rights cases in federal courts. *See* Rosman statement, docket no. 28. Defendants do not challenge the ability of plaintiffs' counsel to prosecute this action vigorously.

Defendants do contest, however, the plaintiffs' ability to satisfy the second prong of the adequacy of representation requirement. Defendants argue that Pyle is not an appropriate class representative because he seeks relief that is adverse to the interests of other members of the class. Specifically, defendants argue that Pyle's demand that the Court issue an injunctive order requiring defendants to offer admission to Pyle, without such a request on behalf of the class he seeks to represent, places Pyle in a position that is adverse to the rest of the class. The Court concludes that Pyle's request for equitable relief specific to him, in addition to a prayer for injunctive relief on behalf of the entire class, does not create a conflict between Pyle and the other members of the injunctive class. *See, e.g., Meiresonne v. Marriott Corp.*, 124 F.R.D. 619 (N.D.Ill.1989) (defendant's argument that because class members compete against each other, none can adequately represent the class is an "absurd proposition" and would doom almost every class action charging discrimination in

promotion); *Orlowski v. Dominick's Finer Foods, Inc.*, 172 F.R.D. 370, 374 (N.D.Ill. 1997). *See also Probe*, 780 F.2d at 780–81 (the fact that the named plaintiffs were pursuing their individual Equal Pay Act claims at the same time as their class Title VII claims did not make them inadequate representatives). Thus, Mr. Pyle is an adequate representative for any class maintained under Rule 23(b)(2).

Because Ms. Rock and Ms. Pyle have attended other law schools and thus seek primarily damages, as opposed to prospective relief, the Court must necessarily consider whether they are adequate representatives of any class maintained under Rule 23(b)(2). Under *Nava*, Ms. Rock and Ms. Smith would have standing to assert a claim for injunctive relief, but they have virtually no chance of obtaining such relief. *See Nava*, 121 F.3d at 459–60. Although the plaintiffs' ability to obtain the relief they seek is a question involving the merits, the Court finds it appropriate to consider this factor in evaluating whether Rock and Smith are adequate representatives. The purpose of the adequacy of representation requirement is to ensure that the rights of absent class members are represented vigorously by qualified counsel and by the class representatives. *National Assoc. for Mental Health, Inc. v. Califano*, 717 F.2d 1451, 1458 (D.C.Cir.1983), *cert. denied sub nom.*, 469 U.S. 817, 105 S.Ct. 85, 83 L.Ed.2d 32 (1984). Although there is no evidence suggesting that Rock and Smith would not vigorously challenge the Law School's admissions policy, Mr. Pyle clearly has a greater interest in curtailing application of the allegedly discriminatory admissions practices of the defendants and ensuring that they are not applied in the future. In addition, Mr. Pyle, unlike Ms. Rock and Ms. Smith, is not precluded by *Nava* from obtaining such relief. Accordingly, the Court finds that it would appropriate at this time to appoint only Mr. Pyle as class representative for any claim certified under Rule 23(b)(2).

Having concluded that the requirements of Rule 23(a) are satisfied, the Court now considers whether the plaintiffs have met the requirements of Rule 23(b)(2).

## 2. *Rule 23(b)(2) Requirements*

Rule 23(b)(2) permits a class action to be maintained if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). Plaintiffs allege that defendants have discriminated against Caucasian applicants to the Law School by applying different standards and criteria for admission to Caucasians than to other racial and ethnic groups. This is a paradigm case for certification under Rule 23(b)(2). *See Amchem Products, Inc. v. Windsor,* —— U.S. ——, 117 S.Ct. 2231, 2245, 138 L.Ed.2d 689 (1997) ("Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of Rule 23(b)(2) classes.).

Defendants challenge (b)(2) certification on grounds that common issues do not predominate over individual issues. Rule 23(b)(2) does not require, however, that common issues predominate over individual issues. That is a requirement for Rule 23(b)(3) certification only. Defendants are confusing Rule 23(a)(2)'s requirement that there be questions of law or fact common to the class with Rule 23(b)(3)'s requirement that common questions predominate over individual questions. In all classes under Rule 23 there must be common questions of law or fact, *see* Rule 23(a)(2), but only Rule 23(b)(3) requires that common issues predominate over individual issues.

Defendants also argue that the defendants have not acted on grounds generally applicable to the class, noting again that each applicant is individually evaluated, and individual applicants may be denied admission for any number of reasons. ⋅ The issue subject to certification under Rule (b)(2), however, is the question of whether defendants' admissions process discriminated against Caucasian applicants as a group. "Action or inaction is directed to a class within the meaning of [Rule 23(b)(2) ] even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class." Rules Advisory Committee Notes to subdivision (b)(2). The question of whether defendants intentionally discriminated against Caucasian applicants on the basis of race in violation of the Fourteenth Amendment is a suitable issue for class treatment under Rule 23(b)(2).

Defendants argue, relying on the doctrine of necessity, that the Court should exercise its discretion not to certify this class because individual injunctive or declaratory relief will inure to the benefit of all those similarly situated. There is no specific requirement in Rule 23(b)(2) that the Court consider need in determining whether to certify an injunctive class. The focus, instead, is on whether the defendants have acted or refused to act on grounds generally applicable to class of persons. Here, the plaintiffs allege that the defendants intentionally discriminated against Caucasians in the application process. Because this is an important constitutional question that affects or impacts the class as a whole, the Court exercises its discretion not to apply the doctrine of necessity.

### C. *Class Action for Damages*

The determination of damages will necessarily require this Court to consider the circumstances of each applicant on an individual basis. Important factors in determining damages would include whether the rejected applicant would have been admitted but for the alleged discriminatory conduct; whether the rejected applicant attended law school elsewhere or made other educational or occupational choices; for applicants who did go on to other law schools, what law schools they attended; and how their professional opportunities have been impacted by the denial of admission. Because the damage question turns on the individual circumstances of each applicant, the issue of damages is not appropriate for class treatment. Therefore, plaintiff's motion for class certification is DENIED to the extent it seeks certification of any class claim for damages.

### D. *Conclusion re Class Certification*

The Court concludes that a class action should be maintained under Rule 23(b)(2). Certification will be granted as to the issue of liability: whether the defendants' admissions policy and practices discriminate against Caucasians on the basis of race in violation of

the Fourteenth Amendment. The class will consist of all Caucasian applicants who applied to the University of Washington Law School for class years 1994–95, 1995–96, 1997–98, and 1998–99, and were denied admission. The class will be represented by Mr. Pyle.

The class is limited to claims for injunctive and declaratory relief. Claims for damages turn on individual circumstances and will not be addressed on a class-wide basis. To the extent the named plaintiffs have claims for damages, they will be dealt with only after liability is established.

Class actions certified under Rule 23(b)(2) do not require notice or permit members to opt out, although a court in its discretion may provide for an opt-out or notice. *See* Rule 23(d); *Tosti v. City of Los Angeles,* 754 F.2d 1485, 1489 n. 3 (9th Cir.1985). In a Rule 23(b)(2) class action for equitable relief, the due process rights of absent class members generally are satisfied by adequate representation alone. *See Besinga v. United States,* 923 F.2d 133, 137 n. 7 (9th Cir.1991). The Court concludes that no notice or opportunity for opting out is necessary at the present time. Allowing class members to opt out would add a substantial administrative burden, yet at the same time would have very little impact on the plaintiffs' claim for declaratory and injunctive relief. If the Law School's admissions policy is ultimately found to be unconstitutional, it will be enjoined regardless of whether some class members are content with that policy.

#### IV. *Motion for Bifurcation*

The Court hereby GRANTS the plaintiffs' motion for bifurcation. The issue of liability shall be tried first. If the defendants' admissions practices are found to be unconstitutional, the Court will then determine how to proceed on the matter of damages.